794 A.2d 260 (2002)
350 N.J. Super. 43
STATE of New Jersey, Plaintiff-Respondent,
v.
Benhart BAKKA, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted February 4, 2002.
Decided April 10, 2002.
*261 Peter A. Garcia, Acting Public Defender, for appellant (William Welaj, Designated Counsel, of counsel and on the brief).
Peter C. Harvey, Acting Attorney General, for respondent (Janet Flanagan, Deputy Attorney General, of counsel and on the brief).
Before Judges HAVEY, COBURN, and WEISSBARD.
The opinion of the court was delivered by WEISSBARD, J.A.D.
In this case we hold that evidence that defendant was driving while his license was revoked was inadmissible in a prosecution for various offenses arising out of an automobile accident in which the passenger in defendant's vehicle was fatally injured. We conclude that defendant was *262 prejudiced by the admission of this license revocation evidence on the issue of whether he was operating the vehicle with the requisite state of mental culpability, and therefore reverse his convictions on all counts.
Defendant, Benhart Bakka, appeals from his conviction, after a trial by jury, on all three counts of an indictment charging third degree operation of an unlawfully taken motor vehicle in a manner likely to create a risk of injury, N.J.S.A. 2C:20-10(c) (count one), first degree aggravated manslaughter, N.J.S.A. 2C:11-4 (count two), and second degree vehicular homicide, N.J.S.A. 2C:11-5 (count three). The trial judge also found defendant guilty on two motor vehicle offenses, driving while intoxicated (DWI), N.J.S.A. 39:4-50, and operating a motor vehicle while his license was suspended, N.J.S.A. 39:3-40.
At sentencing, the court granted the State's motion to impose an extended term based on defendant's persistent offender status, N.J.S.A. 2C:44-3a. The extended term of life imprisonment with twenty-five years of parole ineligibility was imposed on count two. A five-year prison term with two and one-half years of parole ineligibility was imposed on count one, concurrent with the life sentence. Count three was merged with count two. Appropriate penalties were also imposed.
On the motor vehicle offenses, Bakka was sentenced to 180 days in the County Correctional Institution, a ten-year loss of license for DWI, and a ten-day jail term with a six-month license suspension for driving with a suspended license. The county jail terms were consecutive to the life sentence and consecutive to each other.
On appeal, defendant raises the following issues:
I. WHETHER THE TRIAL COURT ERRED IN PERMITTING THE STATE TO INTRODUCE EVIDENCE THAT DEFENDANT'S DRIVING PRIVILEGES WERE REVOKED SINCE IT WAS NOT ADMISSIBLE TO PROVE RECKLESSNESS, THEREBY DENYING DEFENDANT HIS RIGHT TO A FAIR TRIAL?
II. WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT THE ORAL AND WRITTEN STATEMENTS MADE BY DEFENDANT WERE ADMISSIBLE?
A. WHETHER DEFENDANT WAS SUBJECTED TO CUSTODIAL INTERROGATION AND WHETHER THE TRIAL COURT ERRED IN CONCLUDING OTHERWISE?
B. WHETHER THE TRIAL COURT ERRED BY CONCLUDING THAT EVEN IF DEFENDANT WAS SUBJECTED TO CUSTODIAL INTERROGATION, THE ORAL STATEMENTS GIVEN WERE VOLUNTARY IN NATURE?
C. WHETHER DEFENDANT'S STATEMENTS GIVEN AT THE HOSPITAL TAINTED THE WRITTEN STATEMENT OBTAINED FROM DEFENDANT, WARRANTING ITS EXCLUSION AS WELL?
III. WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A MISTRIAL ARISING OUT OF TESTIMONY ELICITED FROM A POLICE OFFICER INDICATING THAT DEFENDANT HAD PREVIOUSLY BEEN INCARCERATED?
IV. WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SEVER COUNT I FROM COUNTS II AND III?
V. WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT'S *263 MOTION FOR A JUDGMENT OF ACQUITTAL AS TO COUNT II?
VI. WHETHER THE TRIAL COURT ERRED IN RULING THAT TWO OF DEFENDANT'S THREE PRIOR CONVICTIONS WERE ADMISSIBLE TO ATTACK CREDIBILITY?
VII. WHETHER THE TRIAL COURT ERRED IN NOT MERGING DEFENDANT'S DRUNK DRIVING CONVICTION INTO COUNT III? (Not Raised Below)
VIII. WHETHER DEFENDANT'S SENTENCE IS EXCESSIVE?
On January 2, 1997, Eileen McCray, who was involved in an estranged boyfriend/girlfriend relationship with Bakka, was driving her 1998 Acura Integra in the area of Route 37 and Hooper Avenue in Toms River. McCray saw Bakka, who flagged her down. After some discussion, Bakka finally entered McCray's car and said that he wanted to drive. McCray declined because Bakka was "not licensed."
After a brief stop, Bakka took control of the car and drove to the Lakehurst Motel where they rented a room to talk about their relationship. Bakka was angry and McCray could tell that he had been drinking. As a result, McCray left Bakka in the motel room and drove off but returned about an hour later to find him with an almost empty pint bottle of vodka that had not been there earlier. Bakka's anger continued unabated. Eventually, he took McCray's car keys and left at about 10:45 p.m. McCray went to the police station and signed a complaint concerning Bakka's taking of the vehicle.
According to Eddie Leugo, one of Bakka's roommates, Bakka returned home around midnight. Leugo had been sleeping but Bakka's loud talk caused him to awake. Leugo testified that Bakka was quite drunk. Leugo and Bakka began arguing, which caused their other roommate, Wayne Teague, to awake. Thereafter, Teague and Bakka began drinking heavily. Leugo went to bed around 5:00 a.m. and when he awoke around 7:30 a.m., Bakka and Teague were gone.
Jane Gross testified that just before 11:00 a.m. on January 3, 1997, she was traveling 55 m.p.h. northbound on the outer, local lanes of the Garden State Parkway when a black Acura passed her at a high rate of speed and eventually "drifted" out of its lane and hit the left guardrail. The Acura then moved diagonally across the parkway lanes, hit the guardrail on the right side, spun around, then crossed over the grassy median of the parkway into the inner, express lanes of traffic, colliding with a 1995 Yukon SUV.
The driver of the Yukon, Eric Haberstroh, testified that his car eventually stopped about fifty feet from where it was hit. Haberstroh walked back to the Acura, and related his observations of the occupants:
Well, out of the passenger side of the carthe car was directly in the middle of the road, across the road now. And as I walked up I saw this fellow, say from the top half of his body, arms hanging out, and his head down, bleeding very profusely. And I knew there was no help for him.
So I walked around the front of the car and I saw this fellow in a semi-prone position in the driver's seat. Like laying back like this. So I motioned to him with my hands like this, and he nodded his head. And he didn't seem to be in any pain. His eyes were open. He wasn't in immediate need of help. So I just stepped back and I waited for the police to come.
*264 Haberstroh stated that Bakka's "feet were underneath the steering wheel and the pedals."
At 11:16 a.m., New Jersey State Troopers James Miani and Richard Laverty responded simultaneously to the scene. Miani approached the Acura and saw that Teague "had catastrophic head trauma; he was hanging out of the passenger's side window from the waist up," and "his rear end and legs" were in the car. Miani observed that Teague had not gone through any glass; the window having been rolled down when the car hit the guardrails.
Miani observed that Bakka was conscious and "had his back actually leaning against the legs and buttocks of [Teague]. [Bakka's] left foot was partially across the seat, his foot hanging down where the normal driver foot would be." The accelerator was about ten inches away from his right foot. Miani entered the car and "detected a strong odor of an alcoholic beverage coming directly from [Bakka's] breath." In fact, Bakka's blood alcohol content at the time of the accident was later determined to be 0.271%. Bakka told Miani that his back was injured and that he was not the one driving.
Laverty related the following:
When I approached the defendant I immediately detected a strong odor of alcoholic beverage emitting from his breath. The defendant began to speak in a rambling and slurred manner.
The defendant claimed to have no identification on his person. The defendant continued to ramble on about using pain medication and drinking alcohol prior to the accident.
Bakka was cervically immobilized as a precaution and placed in an ambulance for transportation to the Riverview Medical Center. Paramedic John Shook conducted a trauma assessment of Bakka in the ambulance. Shook testified that he also smelled a strong odor of alcohol about Bakka. Although Bakka's speech was slurred, Shook found him to be "alert," and "oriented," and answering "all questions appropriately and promptly." Shook deliberately transposed certain information in an effort to trick Bakka; however, Bakka corrected Shook's deliberate errors.
State Trooper Patrick O'Dwyer went to Riverview Medical Center in order to obtain a blood sample and information about the accident from Bakka. When O'Dwyer got to the hospital, Bakka was immobilized on a back board, wearing a neck brace and in obvious pain. O'Dwyer told Bakka that he was under arrest and administered Miranda[1] warnings. Bakka signed the Miranda warning card and allowed a nurse in the emergency room to take the blood sample.
O'Dwyer testified to the following conversation he had with Bakka at the hospital:
I told him, "What happened, Ben?" And he responded, "I picked up my friend Wayne. We went to go home. I hit the guardrail. I blacked out."
And second question I asked him was, "Who owns the Acura, Ben, do you know?" And he responded, "Yeah. It's my girlfriend's car. I just got out of jail."
* * *
"Benhart, I know you are hurting right now. Do you know that you are under arrest for being under the influence and in this accident?" And Mr. Bakka continued to cry and stated that he wasn't a scum bag or a bad guy, and just wanted to go home.
*265 Bakka also told O'Dwyer that he was depressed and took pain pills. Although Bakka was in pain and apparently under the influence of alcohol, O'Dwyer believed Bakka understood clearly what the officer was saying. Shook, who was also present, corroborated O'Dwyer's testimony in that regard.
Laverty testified that among Bakka's personal belongings turned over to him by medical personnel at Riverview were two pill bottles: one bottle contained Meprobamate and one contained Paxil. The labels on the pill bottles stated, "may cause drowsiness," and indicated that the prescriptions had been issued to Bakka.
The State presented testimony from Reginald Grant, an accident reconstruction expert, who performed an occupant kinetics analysis of the car crash. In light of the damage to both the car and the guardrail, Grant stated that "[t]here would be no expectation or any reasonable expectation whatsoever that [the occupants of the vehicle] would be moved from any position other than where they were sitting when they approachedwhen the vehicle approached and collided with the guardrail." Grant stated that based on the collision diagram and the compartmentalization of the vehicle, the only place for Bakka to have been seated was in the driver's position. Grant's expert opinion was that Bakka was the operator of the vehicle.
On January 6, 1997three days after the accidentState Police Detective Anthony Sempkowski was informed that Bakka was being discharged from Riverview Medical Center. Sempkowski went to the hospital and met with Bakka in order to obtain a formal statement regarding the accident. Sempkowski advised Bakka that he was not obligated to comply; however, "[Bakka] wanted to cooperate."
The two left the hospital and drove in a police vehicle to the Holmdel State Police Barracks where Sempkowski advised Bakka of his Miranda rights, and proceeded to take a five-page, formal statement. In that statement, Bakka said that he was "guessing" that he was driving at the time of the accident, but that it "bothered" him that he could not fully remember. Bakka's version of the events leading up to the accident differed somewhat from McCray's version. He admitted to having three drinks at a bar before meeting McCray, and then drinking seven to nine beers while with McCray and while he was alone in the motel. He stated that he consumed two "stiff" drinks, mixed by Teague, before leaving their apartment in the morning, and another drink before the accident, possibly at a rest area.
Although there was no conclusive evidence that Bakka was under the influence of either Paxil or Meprobamate at the time of the accident, an assistant medical examiner testified that both drugs should never be used in conjunction with alcohol because they will cause drowsiness. The witness stated that "[i]f you are driving, it is very dangerous to use in combination with alcohol," and that a person with a blood alcohol level of 0.271% who simultaneously takes Paxil and Meprobamate would have a greater level of impairment than someone who is just drinking alcohol.
Testifying in his own defense, Bakka stated that after Leugo went to bed on January 2-3, he and Teague had two to three vodka and sprite drinks, which Teague prepared. Bakka eventually went to bed at midnight, woke up around 6:00 a.m., took a shower, and had some more vodka and sprite drinks with Teague (who was awake when Bakka got up), which Teague again mixed. Bakka and Teague left the house at 9:00 a.m. because Teague needed a ride "up north to a truck stop somewhere where somebody owed him some money." Before leaving, Bakka took both *266 of his medications. Bakka drove the Acura up the Garden State Parkway northbound, with Teague as the front-seat passenger. Teague mixed more vodkas and sprites, which the two consumed while driving. They stopped at a rest area for food while on the parkway, and, according to Bakka, "Wayne went inside and got food. I remember, I remember him walking in, and that's the last I remember." The next thing Bakka remembered was waking up in a hospital. The scene of the accident was about eleven miles north of the rest area.

I.
Prior to opening statements, the State sought a ruling that would permit the introduction into evidence of the fact that defendant was driving on the revoked list at the time of the accident.[2] After argument and consideration of briefs, the trial judge agreed to admit the evidence, concluding that the conscious decision of the defendant to violate the law by driving while his license was suspended was a factor that could be considered by a jury on the issue of recklessness. The evidence subsequently came before the jury at several points in the trial: (1) through McCray's testimony that defendant was "not licensed"; (2) by stipulation that defendant's license was revoked on the date of the accident; and (3) through cross-examination of defendant.
Evidence is relevant if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401; see also State v. Hutchins, 241 N.J.Super. 353, 358, 575 A.2d 35 (App.Div.1990). Although the admissibility of evidence that defendant was operating a vehicle while on the revoked list has never been discussed in a criminal case in New Jersey, a closely related issue has been addressed in the civil context. In Mattero v. Silverman, 71 N.J.Super. 1, 176 A.2d 270 (App.Div.1961), certif. denied, 36 N.J. 305, 177 A.2d 490 (1962), a negligence action arising out of an automobile accident, the trial court had permitted evidence that plaintiff was an unlicensed driver operating his vehicle with a learner's permit, in violation of N.J.S.A. 39:3-10 and 39:3-13. Id. at 6, 176 A.2d 270. We reversed, holding that "the lack of a license stands as a neutral fact, irrelevant to the issue of a driver's negligence, unless it be shown directly or by reasonable inference that this was a moving and efficient cause of the accident." Id. at 8, 176 A.2d 270. We went on to state that "the statutory violation, to be evidential, must be causally related to the happening of the accident, since a permissible inference of causality is indispensable to its relevancy." Id. at 9, 176 A.2d 270. The rule set out in Mattero reflects, as the court noted, the weight of authority in other jurisdictions. Id. at 7-8, 176 A.2d 270; R.P. Davis, Annotation, Lack of Proper Automobile Registration or Operator's License as Evidence of Operator's Negligence, 29 A.L.R.2d 963, 970 (1953); see also Lawrence v. Taylor, 8 P.3rd 607, 610 (Colo.App.2000).
We fail to see any meaningful distinction between driving while on the revoked list and driving while unlicensed. Indeed, there is less reason to admit evidence of license revocation than of unlicensed driver status since the driver on the revoked list presumably has the basic ability to operate a motor vehicle while the unlicensed driver may not. The distinction is pointed up by the decision in Commonwealth v. Piper, 183 Pa.Super. 229, 130 *267 A.2d 195 (1957). There, the defendant had been out one night drinking with a companion, and, finding himself intoxicated, defendant told his friend to drive. Id. at 196. The friend informed defendant that she not only did not have a license, but had never driven a car before and did not know how to drive. Ibid. Defendant, nevertheless, started the engine and told his friend how to drive. Ibid. Predictably, the car traveled only a few blocks before the driver lost control and hit an oncoming vehicle, killing its passenger. Ibid. In that case, the court was able to conclude that the driver's lack of license was admissible as probative of her inability to drive and defendant's culpability in permitting her to do so. Id. at 197. Of course, by contrast, in the present case the evidence suggests that defendant had considerable experience driving and the accident was not caused by his general inability to operate a vehicle, as opposed to his inability to operate it properly on this occasion. Thus, we see no reason why the rationale of Mattero should not be applied in this criminal case.
Criminal cases in other jurisdictions have addressed this question. In Madison v. State, 40 Ala.App. 62, 109 So.2d 749, 753 (1958), cert. denied, 268 Ala. 699, 109 So.2d 755 (Ala.1959), the court, in reversing a manslaughter conviction resulting from a fatal accident due to admission of evidence that defendant's license was revoked, stated succinctly: "With or without a license, the manner of driving is not affected." In Commonwealth v. Williams, 133 Pa.Super. 104, 1 A.2d 812 (1938), the court confronted a conviction for involuntary manslaughter premised solely upon a death resulting from defendant's commission of an "unlawful act," which was the operation of a vehicle without a license. In reversing defendant's conviction and ordering a judgment of acquittal, the court stated that "the unlawful act must be something more than an attendant condition without which the death could not have occurred; that the death must be the natural result or probable consequence of the unlawful act." Id. at 815. The court rejected the type of "but for" causation urged by the State in this case, stating:
In the instant case, it is true that the death would not have occurred if appellant's automobile had not been on the highway. Its presence was unquestionably a condition without which Vincent's death could not have taken place. But appellant's violation of the Vehicle Code had no direct relationship to the death.

[Ibid.]
We acknowledge that cases from other jurisdictions have, under a variety of circumstances, permitted evidence in vehicular homicide prosecutions that the defendant was driving with a revoked or suspended license. However, those decisions generally contain no analysis of the issue and we do not find them helpful. See McGhee v. State, 333 So.2d 865 (Ala. Crim.App.1976); State v. Yowell, 184 Kan. 352, 336 P.2d 841, 849-50 (1959); State v. Thomas, 17 N.C.App. 8, 193 S.E.2d 450 (1972). Indeed, in each of those cases, the convictions were actually reversed, rendering the courts' statements dictum. In two other cases, courts permitted evidence that a defendant's license was revoked along with evidence that the defendant had prior DWI convictions. Because those opinions do not separate out the license revocation evidence for discussion, see United States v. Loera, 923 F.2d 725, 729 (9th Cir.), cert. denied, 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 128 (1991); State v. Vowell, 276 Ark. 258, 634 S.W.2d 118 (1982), they likewise provide no guidance on the issue before us.
To be probative on the issue of defendant's recklessness, the lack of a valid *268 driver's license had to be causally related to defendant's driving conduct that resulted in the fatal accident. That critical connection was absent in this case.[3] To reason, as the trial judge did here, that the lack of license demonstrated a lack of respect for the law and was thus probative of recklessness, proves too much. By that same logic, the fact that defendant was driving a car without the owner's consent should have been admissible on the issue of recklessness, a proposition that would not withstand serious scrutiny and is not advanced by the State here. Many offenders are engaged in one form of illegal conduct while committing another, but we are unable to find any precedent for the proposition that disregard of the law is itself a factor to be evaluated in determining a defendant's level of mental culpability.
Although driving on the revoked list is not a "crime," it is certainly within the scope of the other "wrongs or acts" proscribed by N.J.R.E. 404(b). Biunno, Current N.J. Rules of Evidence, comment 7 on N.J.R.E. 404 (2001). While the State's purpose in offering the revocation evidence, to substantiate defendant's recklessness, does not fit neatly into the purposes set out in N.J.R.E. 404(b), those examples "are not intended to be exclusive." State v. Stevens, 115 N.J. 289, 300-01, 558 A.2d 833 (1989). Whatever the purpose, however, a precondition of admissibility under the rule is that the evidence be "relevant to a material issue in dispute." See State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992). Since we have determined that the evidence was not relevant, no further N.J.R.E. 404(b) analysis is required, nor need we address the potential impact of N.J.R.E. 403.
Finally, the State's reliance on State v. Fearick, 69 N.J. 32, 350 A.2d 227 (1976), is misplaced. There, the Court was reviewing the mandatory jail term imposed by N.J.S.A. 39:3-40 upon a driver who, while on the revoked list, was involved in an accident resulting in personal injuries. Fearick, supra, 69 N.J. at 34, 350 A.2d 227. In the course of rejecting Fearick's contention that the jail term only applied if the driver was at fault in the accident, the Court referred to the "legislative goal to protect the public, as well as the suspended driver himself, by removing presumptively unsafe drivers from the road...." Id. at 37, 350 A.2d 227. Given the entirely different context in which the Court's observation was made, we do not find Fearick dispositive of the issue before us.
We must still decide whether the erroneous admission of this evidence resulted in prejudice to defendant or was harmless. R. 2:10-2. There is no doubt that the evidence was quite overwhelming, both as to defendant's identity as the driver and as to his intoxication. However, there was little, if any, evidence about the manner in which defendant was driving when he crashed the vehicle. The only witness, Jane Gross, testified that defendant "zoomed past" her while she was going 55 m.p.h. and "drifted" out of his lane, striking the guardrail and causing him to apparently lose control of the car. The State's accident reconstruction expert attributed the accident to "oversteering" by defendant after hitting the left guardrail. Thus, defendant was speeding and not in full control of his vehicle, likely as a result of drinking, medication, and lack of sleep.
*269 Defendant was convicted of aggravated manslaughter, which requires that "the actor recklessly causes death under circumstances manifesting extreme indifference to human life." N.J.S.A. 2C:11-4a. The court properly charged the jury as to the meaning of "recklessly," as defined in N.J.S.A. 2C:2-2b(3), and, with respect to "circumstances manifesting extreme indifference to human life," instructed the jury not to "focus on the defendant's state of mind but rather on the circumstances under which you find he acted." The jury was instructed that vehicular homicide similarly requires that the death be caused by driving a vehicle recklessly, N.J.S.A. 2C:11-5a.[4] The court also charged the jury on the elements of DWI, N.J.S.A. 39:4-50, and driving while one's license has been suspended or revoked, N.J.S.A. 39:3-40, and instructed that, if satisfied defendant violated either of those statutes, the jury could consider such fact, along with all of the other evidence, in deciding whether he acted recklessly.
With respect to the offense charged in count one, there are two distinct components, one related to the taking of the vehicle, the other as to its operation. Concerning the former, the statute prohibits taking, operating, or exercising control over a vehicle without the consent of the owner, with purpose to withhold it temporarily from the owner. N.J.S.A. 2C:20-10c. As to this prong, the mental state is clearly spelled out by use of the words "with purpose," which means "purposely." N.J.S.A. 2C:2-2b(1). It is not as clear, however, what level of mental culpability is applicable to the second component of the offense, operation of the vehicle "in a manner that creates a risk of injury." If no requisite mental state could be gleaned from the statute, then the gap-filler provision, N.J.S.A. 2C:2-2c(3), would come into play and "knowingly" would be the applicable mental state. However, it could be argued that because purposeful action applies to one element of the offense, it should apply to all. N.J.S.A. 2C:2-2c(1). Such a construction would avoid the unusual situation of having different mental states applicable to different elements of the same statutory offense. See State v. Demarest, 252 N.J.Super. 323, 331, 599 A.2d 937 (App.Div.1991). A similar question was addressed in State v. Dixon, 346 N.J.Super. 126, 135-36, 787 A.2d 211 (App. Div.2001), but it would appear that the basis of the result there was the structure of the eluding statute, N.J.S.A. 2C:29-2b, which differs significantly from the offense at issue here.
In any event, the parties have not briefed this interesting issue and we need not decide it at this time. The trial judge charged the jury as to the definition of purposely, N.J.S.A. 2C:2-2b(1), without making any distinction between the two components, an approach that seems to be sanctioned by the model charge. See Model Criminal Jury Charge (N.J.S.A. 2C:20-10b and -10c). Given that instruction, which focuses on whether defendant had the "conscious object" to engage in the proscribed conduct, in this case the operation of the vehicle, so as to create a risk of injury, or "is aware of the existence of such" risk, we have no doubt that the revocation evidence could and likely did impact the jury's determination that defendant possessed the required mental state.
Under these circumstances, we cannot conclude that the admission of the license revocation testimony was harmless error. Evidence of uncharged bad conduct *270 is inherently prejudicial. State v. Nance, 148 N.J. 376, 386, 689 A.2d 1351 (1997); Stevens, supra, 115 N.J. at 302-03, 558 A.2d 833. In this case, the prejudice was not merely general but quite specific. The prosecutor used the evidence to affect severely defendant's credibility on cross-examination and in summation specifically referred to defendant being on the revoked list at least three times. Indeed, the prosecutor concluded his summation as follows:
My burden is to prove this case to you beyond a reasonable doubt. Beyond a reasonable doubt, he was the driver. He caused the death of Wayne Teague. And he did so driving the vehicle not only recklessly at almost three times the legal blood limit, 60 chances, 60 times the likelihood of risk, but he did it recklessly under circumstances manifesting extreme indifference to Wayne Teague, whether it was Wayne Teague's or anybody else who happened to have the misfortune to be on the roadway with him, the guy who was on the revoked list. The guy who said, well, I'm going to try to get away with it.
[Emphasis added.]
Given the court's charge, in conjunction with the prosecutor's comments, we conclude that the improperly received evidence clearly had the capacity to influence the jury's verdict on the homicide charges, despite the strength of the State's case.
Because there was essentially no dispute that defendant took the vehicle without McCray's consent, it is less clear that the license revocation evidence, which the court told the jury it could consider on the issue of "recklessness," could have prejudiced the defendant on the unlawful taking charge. Nevertheless, given its highly inflammatory nature and the fact that the court did not expressly limit the jury's consideration of the evidence, see Cofield, supra, 127 N.J. at 340-41, 605 A.2d 230, we have no assurance that the jury did not consider the license revocation in finding defendant guilty of count one. Indeed, it might well be questioned whether a limiting instruction "no matter how meticulously phrased" could "offset the devastatingly prejudicial impact" of this proof. Id. at 342, 605 A.2d 230 (Stein, J., concurring). Accordingly, we conclude that defendant must receive a new trial on count one as well.
(At the request of the Court, Parts II, III, IV, V, VI, VII, and VIII of this opinion have been excluded from publication.)
Reversed and remanded for a new trial.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Bakka's license had been suspended for ten years on September 23, 1991 and again on February 8, 1996 for another ten years for driving while under the influence of alcohol and driving while on the revoked list.
[3] Our conclusion is entirely consistent with N.J.S.A. 2C:2-3c since it cannot be said that a fatal accident is "within the risk" of which someone driving on the revoked list "is aware."
[4] During deliberations, the jury asked for reinstruction on "circumstances manifesting extreme indifference to human life." In response, the court decided to recharge on aggravated manslaughter in its entirety.