826 A.2d 604

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. BEN-HART BAKKA, A/K/A ROBERT BAKKA AND BENHARD BAKKA, DEFENDANT–RESPONDENT.

Argued February 19, 2003—Decided July 1, 2003.

534

536

*Janel Flanagan,* Deputy Attorney General, argued the cause for appellant (*Peter C. Harvey,* Acting Attorney General of New Jersey, attorney).

*Alyssa A. Aiello,* Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

The opinion of the Court was delivered by

ZAZZALI, J.

The primary issue in this appeal is whether a defendant's operation of a vehicle with a revoked license, absent any indication of the reasons for that revocation, is probative of recklessness within the meaning of the aggravated manslaughter, *N.J.S.A.* 2C:11–4a, or vehicular homicide, *N.J.S.A.* 2C:11–5, statutes.

This matter arose after defendant Benhart Bakka was involved in a vehicular accident on the Garden State Parkway that killed his friend Wayne Teague. A jury convicted defendant of first-degree aggravated manslaughter, *N.J.S.A.* 2C:11–4a(1), second-degree vehicular homicide, *N.J.S.A.* 2C:11–5, and third-degree unlawful taking of a means of conveyance, *N.J.S.A.* 2C:20–10(c). The Appellate Division reversed defendant's convictions, finding that the trial court improperly admitted evidence that defendant was driving with a revoked license at the time of the accident. *State v. Bakka,* 350 *N.J.Super.* 43, 55–56, 794 *A.2d* 260 (2002). The panel below found that the improper evidence "clearly had the

capacity to influence" the jury's verdict and therefore remanded for a new trial on all counts. *Id.* at 58–59, 794 *A*.2d 260.

We agree with the Appellate Division that evidence that defendant's license has been revoked by itself cannot be probative of recklessness. We conclude, however, that evidence concerning defendant's revocation was not clearly capable of producing an unjust result in respect of defendant's aggravated manslaughter, vehicular homicide, and unlawful taking by a means of conveyance convictions. We therefore reverse.

I

On January 2, 1997, at approximately 4:00 p.m., Eileen McCray, defendant's estranged girlfriend, was driving to meet defendant following his release from jail. McCray stopped her car when she saw defendant flagging her down at an intersection in Toms River. After a short discussion, McCray asked defendant to enter her vehicle, a black 1989 Acura Integra. Once in the car, defendant told McCray that he wanted to drive, but McCray refused. McCray testified that defendant appeared intoxicated.

Defendant then forcibly took control of the car and drove to the Lakehurst Motel where the couple discussed their relationship. After an argument with defendant, McCray left the motel, returning about an hour later to find defendant with an almost-empty pint of vodka. Defendant took McCray's car keys, leaving the motel at about 10:45 p.m. Shortly thereafter, McCray called the Lakehurst police to report the incident, and later went to the police station to sign a complaint against defendant for taking her car without her permission.

Edwin Leugo, one of defendant's roommates, testified that defendant arrived home around midnight. According to Leugo, defendant was visibly intoxicated, agitated, and argumentative. Another roommate, Wayne Teague, awoke after an argument ensued between Leugo and defendant. Thereafter, defendant and Teague began drinking vodka heavily. Leugo went back to bed

around 5:00 a.m. and when he awoke around 7:30 a.m. defendant and Teague were gone.

Around 11:00 a.m., motorist Jane Gross was traveling approximately 55 m.p.h. northbound in the center local lane of the Garden State Parkway when a black Acura "zoomed" past her at a high rate of speed. She witnessed that vehicle drift into the left lane, striking the left guardrail. Subsequent to the Acura's collision with the left guardrail, the vehicle moved abruptly across the two local lanes and hit the right guardrail. The State's accident reconstruction expert, Reginald Grant, indicated that the abrupt movement to the right was an "over corrective" measure consistent with the actions of a driver under the influence of alcohol. The car then spun around and crossed over the grassy median of the Parkway into the inner express lanes of traffic. There, the car collided at a low rate of speed with the rear passenger-side of a GMC Yukon SUV. The driver of the Acura did not apply the brakes during the entire collision sequence. Moreover, the occupants of the vehicle were not wearing seatbelts. The force of the second impact caused Teague to be partially ejected through the open window of the vehicle's passenger side. Teague's head and arm struck an "I" beam that supported the guardrail.

Immediately after the collision, the driver of the Yukon, Eric Haberstroh, exited his vehicle and walked back to the Acura, which was located approximately fifty feet away. Haberstroh testified that as he approached the vehicle he observed the top half of Teague's body hanging out of passenger's side of the vehicle. Teague's head was bleeding profusely and Haberstroh "knew there was no help for him." Haberstroh then walked around to the driver's side of the car and saw a man, later identified as defendant, in a semi-prone position in the driver's seat. Defendant's feet were beneath the brake and accelerator pedals. After determining that defendant did not need immediate assistance, Haberstroh stepped away from the vehicle and waited for the police to arrive.

New Jersey State Troopers James Miani and Richard Laverty arrived at the scene at approximately 11:15 a.m. Trooper Miani approached the Acura and, like Haberstroh, saw that Teague was "hanging out of the passenger's side window from the waist up" and "had catastrophic head trauma." He stated that defendant appeared conscious and had his back leaning against the legs and buttocks of Teague. Defendant's left foot was partially across the seat and his right foot was "hanging down where the normal driver foot would be." The accelerator and brake pedals were located approximately ten inches away from defendant's right foot.

On entering the vehicle, Miani "detected the strong odor of an alcoholic beverage coming directly from [defendant's] breath." Defendant informed Miani that he had hurt his neck and back. Miani then asked defendant to identify the driver of the vehicle, and defendant replied: "I know it wasn't me. I'm not a bad guy. I didn't do anything wrong." After defendant was removed from the car, Miani examined the car's interior and found a "small bottle of vodka that was partially full" and a twelve-ounce empty beer bottle in the backseat of the vehicle.

Trooper Richard Laverty testified that when he approached defendant he "immediately detected a strong odor of alcoholic beverage emitting from his breath." Laverty stated that defendant "began to speak in a rambling and slurred manner," "claimed to have no identification on his person," and "continued to ramble on about using pain medication and drinking alcohol prior to the accident." Medical personnel at Riverview Medical Center later turned over defendant's personal belongings to Trooper Laverty, which included two pill bottles. One bottle contained Meprobamate, an anti-anxiety prescription drug, and the other contained Paxil, an anti-depressant prescription drug. Labels were affixed to both bottles, indicating that the prescriptions were defendant's and that the drugs "may cause drowsiness."

The paramedics arrived, immobilized defendant on a stretcher, and placed him in an ambulance for transportation to Riverview Medical Center. Paramedic John Shook conducted a trauma

assessment of defendant in the ambulance. Although defendant's speech was slurred, Shook observed him to be "alert" and "oriented," and answering "all questions appropriately and promptly." Shook also detected a strong odor of alcohol about defendant.

Trooper Patrick O'Dwyer followed the ambulance to the Medical Center to obtain information regarding the accident and to obtain a blood sample from defendant. When O'Dwyer arrived at the hospital he located defendant who was supine on a stretcher outside of a patient holding area. O'Dwyer informed defendant that he was under arrest for DWI, and administered *Miranda* warnings. Defendant signed the *Miranda* warning card, which Shook initialed as a witness. O'Dwyer then asked defendant to describe the cause of the accident. Defendant responded: "I picked up my friend Wayne. We went to go home. I hit the guardrail. I blacked out." Defendant also informed O'Dwyer that McCray owned the Acura, and that he had taken medication for depression on the morning of the accident. Defendant consented to the officer's request for a blood sample. The toxicology report indicated that defendant's blood alcohol content at the time of the accident was 0.271%.

Three days after the accident, New Jersey State Police Detective Anthony Sempkowski met with defendant to obtain a formal statement. After being advised of and waiving his *Miranda* rights, defendant gave Sempkowski a five-page statement detailing the events that led up to the accident and the accident itself. Defendant indicated that he had consumed three mixed drinks at a bar before meeting McCray, and then seven to nine beers while with McCray at the motel. He then drove McCray's Acura to his apartment and went to bed around midnight. Defendant awoke around 6:00 a.m., took his medications, Paxil and Meprobamate, consumed two "stiff" drinks mixed by Teague, and then left the apartment to travel "up north" with Teague. While on the road, defendant admitted that he consumed a few more vodka and Sprite drinks, which were mixed by Teague. Although defendant remembered that he was driving at around 10:30 a.m., when he

and Teague stopped for food at a service area, defendant only "guessed" that he was driving at the time of the accident and it "bothered" him that he could not remember.

The State's accident reconstruction expert concluded that defendant was the driver of the Acura. In support of that opinion, the expert stated that "[t]here would be no expectation or any reasonable expectation whatsoever that [the occupants of the vehicle] would be moved from any position other than where they were sitting when ... the vehicle approached and collided with the guardrail." He explained that based on the collision and the compartmentalization of the vehicle, the only place defendant could have been seated was in the driver's position.

At trial, the State presented assistant medical examiner Karabi Sinha who expressed the view that a driver with a blood alcohol content of 0.271% is sixty times more likely to be in an accident than a sober driver. Moreover, Sinha indicated that a person with a blood alcohol content of 0.271% who simultaneously takes antidepressant and anti-anxiety medications "would be greater and farther impaired" than one who is just drinking alcohol.

Defendant testified on his own behalf. Consistent with his formal statement, defendant admitted to consuming three mixed drinks prior to meeting McCray and seven to nine bottles of beer while at the motel. He stated that he then drove McCray's Acura to his apartment, consumed two to three vodka and Sprite drinks, which Teague had prepared, and went to bed around midnight. Defendant woke up around 6:00 a.m., took a shower, had "a couple more drinks" with Teague, and took both his medications before leaving the apartment. Defendant and Teague left their apartment at 9:00 a.m. because Teague needed a ride "up north." While driving the Acura northbound on the Garden State Parkway, Teague, who was in the passenger's seat, mixed more vodka and Sprite drinks, which the two consumed before stopping at a rest area. According to defendant's testimony, at the rest stop "Wayne went inside and got food. I remember him walking in, and that's the last I remember." Following that incident, defen-

dant could only recall waking up in a hospital "strapped to a board almost in [an] upside-down position." Although defendant could not remember the accident, he denied driving the vehicle at the time it occurred.

Prior to trial, the State filed a motion *in limine* to allow it to introduce evidence at trial that defendant was driving with a revoked license at the time of the accident. Following an evidentiary hearing, the trial court agreed to admit the evidence, concluding that the jury could consider defendant's conscious decision to violate the law by driving with a revoked license when determining whether he was reckless within the meaning of *N.J.S.A.* 2C:11–4a(1) and *N.J.S.A.* 2C:11–5. That information came before the jury during the prosecutor's opening statements, through testimony by McCray that defendant was "not licensed," by stipulation that defendant's license was revoked on the date of the accident, during defendant's cross-examination, during the prosecutor's summation, and in the trial court's instructions to the jury.

As noted, the jury convicted defendant of first-degree aggravated manslaughter, *N.J.S.A.* 2C:11–4a(1), second-degree vehicular homicide, *N.J.S.A.* 2C:11–5, and third-degree unlawful taking of a means of conveyance, *N.J.S.A.* 2C:20–10(c). Following the verdict, the trial court found defendant guilty of two motor vehicle offenses: driving while intoxicated (DWI), *N.J.S.A.* 39:4–50, and operating a motor vehicle while his license was suspended, *N.J.S.A.* 39:3–40.

At sentencing, the court granted the State's motion to impose an extended term based on defendant's persistent offender status pursuant to *N.J.S.A.* 2C:44–3a. Defendant previously had been convicted of three indictable offenses, including second-degree eluding in July 1998, possession of a controlled dangerous substance with intent to distribute in July 1991, and possession of a controlled dangerous substance in July 1984. In addition, over a twenty-year period, defendant had been found guilty of driving while intoxicated on five prior occasions and driving while on the revoked list on fourteen prior occasions. His record also included

twenty-two prior arrests. The court imposed an extended term of life imprisonment with a twenty-five year parole disqualifier for aggravated manslaughter. It also imposed a five-year term of imprisonment with two-and-one-half years of parole ineligibility for unlawful taking of a motor vehicle to be served concurrent with the life sentence. The vehicular homicide conviction merged with the aggravated manslaughter conviction.

On appeal, defendant challenged the State's introduction of evidence that he was driving with a revoked license at the time of the accident. The Appellate Division found that the trial court improperly admitted that evidence and vacated defendant's convictions. *Bakka, supra,* 350 *N.J.Super.* at 55–56, 794 *A.*2d 260. The panel concluded that the evidence was not connected logically to a determination of recklessness within the meaning of the aggravated manslaughter and vehicular homicide statutes. *Id.* at 54–55, 794 *A.*2d 260. Further, it determined that "despite the strength of the State's case," the introduction of defendant's revocation had the capacity to influence the jury's verdict and therefore constituted harmful error. *Id.* at 58–59, 794 *A.*2d 260. Accordingly, the panel reversed and remanded for a new trial on all counts.

We subsequently granted the State's petition for certification. 174 *N.J.* 193, 803 *A.*2d 1164 (2002).

## II

A person is guilty of aggravated manslaughter when he or she "recklessly causes death under circumstances manifesting extreme indifference to human life." *N.J.S.A.* 2C:11–4a(1). A person is guilty of vehicular homicide when he or she causes the death of another "by driving a vehicle or vessel recklessly." *N.J.S.A.* 2C:11–5. Both statutes contain the element of recklessness. The New Jersey Code of Criminal Justice (Code) defines recklessness as a conscious disregard of a "substantial and unjustifiable risk that the material element exists or will result from" the defendant's conduct. *N.J.S.A.* 2C:2–2b(3). Moreover, "[t]he risk must be of such a nature and degree that, considering the nature

and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation." *Ibid.* Because the crimes of aggravated manslaughter and vehicular homicide both require a showing that defendant acted recklessly in causing the death of another, we must determine whether driving with a revoked license is probative of recklessness.

Evidence is probative if it tends "to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401. "In determining whether evidence is relevant, the inquiry should focus on 'the logical connection between the proffered evidence and a fact in issue.'" *State v. Darby,* 174 *N.J.* 509, 519, 809 *A.*2d 138 (2002) (quoting *State v. Hutchins,* 241 *N.J.Super.* 353, 358, 575 *A.*2d 35 (App.Div.1990)). Moreover, "[i]f the evidence offered makes the inference to be drawn more logical, then the evidence should be admitted unless otherwise excludable by a rule of law." *State v. Covell,* 157 *N.J.* 554, 565, 725 *A.*2d 675 (1999). Thus, the critical question is whether the fact that defendant drove with a revoked license could lead a juror logically to conclude that defendant consciously disregarded a substantial and unjustifiable risk of death.

## III

Defendant argues that because driving with a revoked license does not tend to show conscious disregard for a substantial and unjustifiable risk of death, the trial court improperly allowed the jury to consider that fact when determining whether defendant was reckless within the meaning of *N.J.S.A.* 2C:11–4a(1) and *N.J.S.A.* 2C:11–5. The State disagrees, arguing that defendant's "conscious disregard for the law," *i.e.,* driving with a revoked license at the time of the accident, is a relevant factor that the jury should consider when determining whether defendant possessed the reckless state of mind required by those statutes.

As the Appellate Division noted below, "[m]any offenders are engaged in one form of illegal conduct while committing another, but we are unable to find any precedent for the proposition that disregard of the law is itself a factor to be evaluated in determining a defendant's level of mental culpability." *Bakka, supra,* 350 *N.J.Super.* at 55, 794 *A.*2d 260. Unlike driving while intoxicated, speeding, or some other conduct from which a reckless state of mind may be inferred circumstantially, the mere fact that a defendant is an unlicensed driver does not by itself suggest an awareness of risk. We therefore find that the trial court improperly instructed the jury that driving with a revoked license at the time of the accident, without specific reasons for that revocation, is probative of recklessness.

■ The Appellate Division also stated that "[t]o be probative on the issue of defendant's recklessness, the lack of a valid driver's license had to be causally related to defendant's *driving conduct* that resulted in the fatal accident." *Bakka, supra,* 350 *N.J.Super.* at 54, 794 *A.*2d 260 (emphasis added). *See State v. Peterson,* 116 *Utah* 362, 210 *P.*2d 229, 231 (1949) (stating that "[w]ith or without a license, the manner of driving is not affected"); *Madison v. State,* 40 *Ala.App.* 62, 109 *So.*2d 749, 753 (1958), *cert. denied,* 268 *Ala.* 699, 109 *So.*2d 755 (1959). However, although recklessness generally may be inferred from the manner in which a vehicle is operated, relevant evidence of a defendant's "driving conduct" is not limited to the manner in which that defendant exercises actual physical control over a vehicle. In *State v. Vowell,* 276 *Ark.* 258, 634 *S.W.*2d 118, 119 (1982), for example, the court held that evidence of the defendant's three prior convictions for DWI and the fact that defendant was driving with a revoked license was admissible, but only for certain purposes. Specifically, it was admissible "to prove the *warning quality* of the other convictions and to infer that the [defendant] must have arrived at a mental state inconsistent with mistake and consistent with the culpable mental state of causing serious physical injury 'under circumstances manifesting extreme indifference to the value of human

life.'" *Ibid.* (emphasis added). Similarly, in *United States v. O'Brien,* 238 *F.*3d 822, 827, 827 n. 2 (7th Cir.2001), the Court of Appeals for the Seventh Circuit concluded that driving with a revoked license could be considered together with the defendant's "checkered driving history" as evidence that the defendant "was well acquainted with the consequences of unsafe driving," and therefore reckless.

■ We agree with the *Vowell* and *O'Brien* courts that revocation introduced along with the reasons for that revocation may be probative of recklessness when the defendant again engages in unsafe conduct identical or similar to that which resulted in the revocation. Under those circumstances, the fact of revocation may serve as an additional "warning" to the defendant of the risks to others when the proscribed conduct is repeated and therefore may be probative of recklessness. *O'Brien, supra,* 238 *F.*3d at 827 n. 2; *Vowell, supra,* 634 *S.W.*2d at 119. Because the State did not provide the reasons for defendant's revocation, however, that issue is not before this Court.

■ In the future, if the State seeks to introduce evidence of a defendant's revocation along with the reasons for that revocation, then the trial court should hold an evidentiary hearing and apply the four-part test established in *State v. Cofield,* 127 *N.J.* 328, 338, 605 *A.*2d 230 (1992). Ultimately, the trial court must determine in a vehicular homicide case whether the probative value of a defendant's revocation or suspension and the reasons for that revocation or suspension will outweigh the potential for undue prejudice. *See State v. Marrero,* 148 *N.J.* 469, 483, 691 *A.*2d 293 (1997); *State v. Ramseur,* 106 *N.J.* 123, 266, 524 *A.*2d 188 (1987).

## IV

■ Having determined that the trial court improperly admitted evidence of defendant's revocation, we now decide whether that error was harmless. *R.* 2:10–2. "The test of whether an error is harmless depends upon some degree of possibility that it

led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." *State v. Bankston,* 63 *N.J.* 263, 273, 307 *A.2d* 65 (1973) (citing *State v. Macon,* 57 *N.J.* 325, 335–36, 273 *A.2d* 1 (1971)). The panel below found that the trial court's admission of defendant's revocation constituted harmful error because of the "inherently prejudicial" nature of "uncharged bad conduct." *Bakka, supra,* 350 *N.J.Super.* at 58, 794 *A.2d* 260. "[D]espite the strength of the State's case," including evidence that "defendant was speeding and not in full control of his vehicle, likely as a result of drinking, medication, and lack of sleep," the panel below determined that evidence of defendant's revocation "clearly had the capacity to influence the jury's verdict on the homicide charges[.]" *Id.* at 56–58, 794 *A.2d* 260. It also concluded that evidence of defendant's revocation "could have prejudiced the defendant" in respect of defendant's conviction for unlawful taking by a means of conveyance. *Ibid.*

■ We disagree with the panel below that the trial court's introduction of defendant's revocation was clearly capable of producing an unjust result in respect of defendant's convictions on aggravated manslaughter, vehicular homicide and unlawful taking by a means of conveyance.

We address first the jury's finding on vehicular homicide and aggravated manslaughter. The trial court instructed the jury that a person is guilty of aggravated manslaughter if that person "recklessly causes the death of another person under circumstances manifesting extreme indifference to human life." *N.J.S.A.* 2C:11–4a(1). The court defined "recklessly" as set forth in *N.J.S.A.* 2C:2–2b(3), and then instructed:

> The phrase under circumstances manifesting extreme indifference to human life does not focus on the defendant's state of mind but rather on the circumstances under which you find he acted. If, in light of all of the evidence, you find that defendant's conduct resulted in a probability as opposed to a mere possibility of death, then you may find that he acted under circumstances manifesting extreme indifference to human life. On the other hand, if you find his conduct resulted in only a possibility of death, then you must acquit him of aggravated manslaughter.

The court also instructed the jury that vehicular homicide requires the State to prove beyond a reasonable doubt that defendant caused Teague's death by driving a vehicle recklessly, *N.J.S.A.* 2C:11–5a. As part of that instruction, the court re-read the Code's definition of "recklessly," *N.J.S.A.* 2C:2–2b(3), and charged the jury on the elements of DWI, *N.J.S.A.* 39:4–50, and driving with a revoked or suspended license, *N.J.S.A.* 39:3–40. The court then instructed the jury that it could consider the fact that defendant violated those motor vehicle offenses, along with all other evidence, when deciding whether defendant possessed the required reckless state of mind.

That "a jury may infer that an individual who drives while intoxicated is consciously disregarding the risk of an accident" is well settled. *State v. Radziwil*, 235 *N.J.Super.* 557, 563, 563 *A.2d* 856 (App.Div.1989) (citing *State v. LaBrutto*, 114 *N.J.* 187, 204, 553 *A.2d* 335 (1989)), *aff'd*, 121 *N.J.* 527, 582 *A.2d* 1003 (1990); *State v. Bogus*, 223 *N.J.Super.* 409, 419, 538 *A.2d* 1278 (App.Div.), *certif. denied*, 111 *N.J.* 567, 546 *A.2d* 497 (1988). Thus, "while intoxication is not necessarily an element of the crime of committing death by auto, a defendant's driving while intoxicated may [by itself] support a determination of recklessness." *LaBrutto, supra*, 114 *N.J.* at 204, 553 *A.2d* 335 (quoting *State v. Casele*, 198 *N.J.Super.* 462, 472, 487 *A.2d* 765 (App.Div.1985) (internal quotations omitted)). A defendant's sobriety or insobriety, however, "is merely one of the circumstances to be considered by the jury." *Ibid.* The jury also may consider other circumstances, such as speeding, lack of control over a motor vehicle, traffic violations, and lack of sleep, to establish that a defendant recklessly operated a vehicle. *See, e.g., State v. DeLuca*, 108 *N.J.* 98, 109–11, 527 *A.2d* 1355 (1987).

Although the crimes of both aggravated manslaughter and vehicular homicide require the element of recklessness, aggravated manslaughter demands a more stringent standard of reckless conduct, namely that the defendant acted "under circumstances manifesting extreme indifference to human life." *N.J.S.A.* 2C:11–4a(1). The jury must determine whether that degree of

recklessness was present in view of all surrounding circumstances. To establish that heightened degree of recklessness, the State must prove beyond a reasonable doubt that defendant's actions created a probability as opposed to the mere possibility that death would occur. *State v. Kotter,* 271 *N.J.Super.* 214, 227, 638 *A.*2d 825 (App.Div.), *certif. denied,* 137 *N.J.* 313, 645 *A.*2d 141 (1994); *State v. Jiminez,* 257 *N.J.Super.* 567, 577–78, 577 n. 1, 608 *A.*2d 996 (App.Div.1992); *State v. Curtis,* 195 *N.J.Super.* 354, 364–65, 479 *A.*2d 425 (App.Div.), *certif. denied,* 99 *N.J.* 212, 491 *A.*2d 708 (1984).

Here, the State presented evidence that defendant's blood alcohol content at the time of the accident was 0.271%, nearly three times the legal limit of 0.10%. Defendant admitted to consuming several "vodka and Sprite" drinks while driving to a rest area on the Parkway shortly before the accident. He also admitted to consuming a significant amount of alcohol during the eighteen-hour period preceding the accident. Several people who came into contact with defendant immediately following the accident detected a strong odor of alcohol. Further, defendant admitted to taking anti-anxiety and anti-depression prescription drugs with alcohol a few hours prior to the accident. Moreover, motorist Jane Gross testified that a black Acura "zoomed" past her while she was traveling approximately 55 m.p.h. and then drifted out its lane. Finally, the State presented evidence that the driver of the vehicle did not apply the brakes during the accident and that the occupants were not wearing seatbelts. Based on that overwhelming evidence of defendant's unsafe driving conduct, we conclude that evidence of defendant's revocation did not lead the jury to a result it otherwise might not have reached on vehicular homicide and aggravated manslaughter. *Macon, supra,* 57 *N.J.* at 336, 273 *A.*2d 1. *See also State v. Koskovich,* 168 *N.J.* 448, 487, 776 *A.*2d 144 (2001) (finding admission of other-crime evidence "not clearly capable of producing an unjust result because, absent those items, there remained strong and overwhelming evidence of defendant's guilt"); *State v. Marrero,* 148 *N.J.* 469, 496, 691 *A.*2d 293 (1997) (finding no plain error when evidence of guilt that was indepen-

dent of erroneously admitted other-crime evidence was "nearly overwhelming").

Because the Appellate Division below concluded that the evidence of defendant's revocation "could have prejudiced the defendant on the unlawful taking charge," *Bakka, supra,* 350 *N.J.Super.* at 58, 794 *A.2d* 260, we now address that issue. A person is guilty of third-degree unlawful taking of means of conveyance if "with purpose to withhold temporarily from the owner," that person "takes, operates or exercises control over a motor vehicle without the consent of the owner or other person authorized to give consent and operates the motor vehicle in a manner that creates a risk of injury to any person or a risk of damage to property." *N.J.S.A.* 2C:20–10(c). At trial, defendant admitted that his ex-girlfriend McCray possessed the title to the Acura and did not give him permission to take or drive her car. Indeed, shortly after defendant absconded with her vehicle, McCray signed a complaint against him for unlawfully taking her car. Moreover, the evidence presented regarding defendant's operation of McCray's car and the nature of the accident supported the jury's finding that defendant unlawfully exercised temporary control over McCray's Acura and operated that car in a manner that created the risk of injury to others or of damage to the car itself. Accordingly, we find that the improper admission of defendant's revocation did not have the capacity to produce an unjust result in respect of defendant's conviction of third-degree unlawful taking of a means of conveyance, *N.J.S.A.* 2C:20–10(c).

Because the Appellate Division reversed defendant's convictions, it did not address defendant's claims regarding his sentence. Accordingly, we remand solely for a determination of whether the trial court improperly imposed an extended term under *N.J.S.A.* 2C:44–3a, or whether defendant's sentence was excessive.

## V

The judgment of the Appellate Division is reversed. We reinstate defendant's convictions and remand solely for a review of his sentence.

LONG, J., dissenting.

I would affirm the decision of the Appellate Division, substantially for the reasons expressed in the thorough and thoughtful opinion of Judge Weissbard. My colleagues in the majority agree with Judge Weissbard that the fact of revocation, standing alone, is inadmissible. Yet they hold that error in this case to be harmless. It is here that I part company from them.

Because it was disembodied from any admissible fact, the only effect of the revocation evidence was to show defendant to be a bad person with an inclination toward criminality, to assure that all evidence in the case would be seen through that lens, and to suggest to the jury that another adjudicative body had declared defendant a menace on the road. Although it is conceivable that in some other case such pernicious evidence could be harmless, it was not so here. The error pervaded the trial as the prosecutor hammered home the revocation in the opening and closing statements, and used it to attack defendant's credibility during his testimony. Poisoning the jury with predisposition evidence requires a new trial on all issues.

I am troubled as well by the majority's statement that "revocation introduced along with the reasons for that revocation may be probative of recklessness when the defendant again engages in unsafe conduct identical or similar to that which resulted in the revocation." *Ante* at 547, 826 *A*.2d at 611–12. The overarching problem with that notion is that once the facts underlying a revocation are admitted, in general, the revocation can add nothing of relevance. Although the majority cites several out-of-state cases as support for a contrary conclusion, *State v. Vowell*, 276 *Ark.* 258, 634 *S.W.*2d 118 (1982); *United States v. O'Brien*, 238 *F*.3d 822 (7th Cir.2001), I note, as did the Appellate Division, that those opinions contain no analysis that will withstand scrutiny. *State v. Bakka*, 350 *N.J.Super.* 43, 54, 794 *A*.2d 260 (2002). Yet the majority has subscribed to their conclusions and declared that when prior conduct that is the subject of a revocation is repeated, the revocation may serve as an "additional warning" to the defen-

dant of the risks his conduct poses to others. *Ante* at 547, 826 A.2d at 612. That is a breathtakingly broad notion.

Indeed, I can conceive of only one limited situation in which a revocation, along with the facts underlying it, would be relevant as a warning. That is the case in which a revocation bears on notice of incapacity to drive. Thus, for example, if a driver has had his license revoked for visual impairment, the revocation bears on the issue of whether he knew he was not competent to drive and chose to do so in the face of that risk. That scenario is substantially different from the run of the mill case involving a revocation for a motor vehicle violation that is nothing more than a punishment for a momentary lapse, and not a commentary on the defendant's capacity to operate a motor vehicle. The majority's broad counter-statement that declares the potential relevance of a class of evidence that should be excluded is insupportable. Except in the limited class of cases to which I have adverted, I would bar any evidence of revocation and require the state to prove the relevance of the underlying facts in every case.

For all those reasons I dissent.

Justice ALBIN joins in this dissent.

*For reversing*—Chief Justice PORITZ and Justices COLEMAN, VERNIERO, LaVECCHIA, and ZAZZALI—5.

*For affirming*—Justices LONG and ALBIN—2.