198 N.J. Super. 462 (1985)
487 A.2d 765
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LAWRENCE F. CASELE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 8, 1985.
Decided February 4, 1985.
*464 Before Judges MICHELS and PETRELLA.
James R. Bodnar argued the cause for appellant.
Robin D. Eckel, Deputy Attorney General, argued the cause for respondent (Irwin L. Kimmelman, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by PETRELLA, J.A.D.
Defendant was convicted of causing death by automobile (N.J.S.A. 2C:11-5), and was thereafter sentenced to 18 months in State Prison with a four-month period of parole ineligibility. He was also ordered to pay a $500 fine and was assessed $25 payable to the Violent Crimes Compensation Board. Defendant's motion for a judgment of acquittal or in the alternative for a new trial was denied. His sentence was stayed pending this appeal. We affirm.
*465 On this appeal defendant contends that the trial judge erred in (1) refusing to suppress the results of his blood alcohol test or to dismiss his indictment based on alleged deprivation of constitutional right to due process because the State failed to demonstrate that the blood sample was withdrawn in a medically acceptable manner, and failed to preserve his blood sample for independent testing; (2) denying defendant's motion for a judgment of acquittal because the State failed to prove that he knowingly operated a vehicle in an intoxicated condition and because there was no evidence that he operated the vehicle recklessly, and (3) imposing an excessive sentence.
Predicated on the proofs adduced at trial the jury could well have found the following facts beyond a reasonable doubt. Defendant Lawrence Casele and his friend Michael Donnelly went out to various taverns on the evening of March 12, 1983. Defendant conceded that he drank two bourbon and sodas at a tavern in Manahawkin where they first stopped. He and his friend then went to a bar on Long Beach Island where defendant drank some more bourbon and soda. They met some young ladies there and went to their house where they had a mixed drink at about 3 a.m. on March 13, 1983.
Defendant testified that while driving back to Long Beach Island from Barnegat at the speed limit a deer ran into the middle of the road and stopped, causing him to try to go around it to the right. Defendant said that when the deer crossed the road to his right, he oversteered to the left, slammed on the brakes and the car slid across the road onto the shoulder and into a telephone pole.
Donnelly, who had been seated in the passenger seat, fell between the bucket seats. Defendant got out of the car, put Donnelly in the back seat and went to seek help. By the time he returned to the scene of the accident, the police and an ambulance had arrived. Patrolman Severini of the Barnegat Township Police Department was dispatched to the scene at 6:15 a.m. Defendant asked the police officer for help for *466 Donnelly who was alive and covered with blood in the back seat of the car. Severini smelled alcohol on defendant's breath and asked defendant whether he had been drinking. Defendant answered affirmatively. He also said that the car had spun and hit the pole when he swerved to avoid hitting a deer. The police officer walked about 75 yards behind the crash site looking for deer tracks in the sandy shoulder of the road, but was not able to find any.
A police officer from the Barnegat Township Police Department whose job involved traffic accident investigation studied the accident scene. That officer testified that based on the "yaw marks" made on the roadway when a tire turned and broke contact with the road, defendant's car had been travelling 53.7 miles per hour. He also said that the shoulder was sandy and that he observed one tire mark on the shoulder for about 110 feet up to the yaw mark, and that the absence of brake marks at the pole area indicated that no brakes had been applied.
Donnelly was taken to the hospital where he later died. Severini then spoke to defendant in the hospital and ascertained that he was willing to submit to a blood test. After defendant filled out a consent form they went to the hospital emergency room where a nurse presented the doctor with a bottle of Cutex nail polish remover which the doctor used to swab defendant's arm before withdrawing blood.[1] At about 9 a.m. the blood was withdrawn into two vials in the presence of Severini who thereafter brought the vials of blood to police headquarters in an ice pack and then transported them to the county laboratory where they were given to an officer who refrigerated them.
Analysis of the blood sample revealed that defendant's blood alcohol level was 0.13%. After the test was completed any *467 remains of the specimen were destroyed. The individual who had done the analysis testified that the mean standard deviation for this test was 0.02% and that the entire blood sample was usually used up during testing.
There was testimony on the State's case to the effect that 0.13% blood alcohol level indicated intoxication and would involve impaired ability to function, which included delayed reaction time. That witness also testified that if the alcohol level was 0.13% at 9 a.m., it was even higher at 6 a.m.
An analytical chemist called by defendant as an expert witness testified that if there were errors resulting from laboratory blunders and subjective evaluations, the blood alcohol content reading of 0.13% could actually have been as low as 0.04% and as high as 0.22%.

I
We reject defendant's argument that the blood sample was not drawn in a medically acceptable manner because nail polish remover, a possible contaminant, was used as a swabbing agent. At the State's request the individual who had done the laboratory tests on the defendant's blood, analyzed a bottle of Cutex nail polish remover and concluded that there was no "acetone interference" with the determination of alcohol level in the blood. He also testified that he had conducted experiments demonstrating that the alcohol concentration in blood specimens did not increase over a three-month period even when no preservatives were used. Here only a short period of time expired and a preservative had been added. Defendant in his brief acknowledges that State v. Rypkema, 191 N.J. Super. 388, 392-393 (Law Div. 1983), indicated that proof that the blood sample had been obtained in a hospital by qualified medical personnel ordinarily suffices to establish the requirement that the blood was drawn in a medically acceptable manner and environment. However, defendant argues that Rypkema is distinguishable because the doctor's use of nail polish remover *468 to swab defendant's arm before withdrawing blood, places the chemical integrity of the blood in doubt.
Defendant relies on People v. Douglas, 16 Misc.2d 181, 183 N.Y.S.2d 945, 946 (Cty.Ct. 1959) and People v. Ward, 14 Misc.2d 518, 178 N.Y.S.2d 708, 709 (Cty.Ct. 1958), wherein the respective trial judges had suppressed blood test results in drunk driving prosecutions because defendants' arms had been swabbed with alcohol before blood was withdrawn. Unlike the present case, however, in those New York cases there had been testimony by the chemists who examined the blood specimens that the traces of alcohol on defendants' skin might have affected the test results by producing an elevated alcohol level. We neither express approval of those opinions nor indicate that we would follow such reasoning in this State.
There is no evidence in the case before us that the use of nail polish remover as a swabbing agent affected the blood test results in any way. Indeed its use precluded a claim of potential external alcohol influence on the test results.[2] We are satisfied that under the circumstances existing here, where the blood was taken by a physician, assisted by a nurse in a hospital emergency room and where there was no showing of unacceptable behavior, nor evidence that the swabbing agent affected the results, that the sample was withdrawn in a medically acceptable manner. See State v. Woomer, 196 N.J. Super. 583, 585-587, (App.Div. 1984); State v. Burns, 159 N.J. Super. 539, 544 (App.Div. 1978).

II
In connection with defendant's argument that he was denied due process by the State's failure to retain any portion of the blood sample, defendant relies in part on Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), which held that "the suppression by the prosecution of *469 evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." There, a request to examine the accomplice's extra-judicial statements was the basis for defendant's motion for a new trial based on newly discovered evidence. Defendant also argues that he was precluded from obtaining his own independent tests of the blood sample taken, and inferentially that his ability to cross-examine expert witnesses was affected.[3]
Defendant's arguments fail based on our prior decision in State v. Kaye, 176 N.J. Super. 484 (App.Div. 1980), certif. den. 87 N.J. 316 (1981). In that case defendant had been convicted of causing death by automobile. He had argued that the blood alcohol test results should be excluded because the State had not saved a portion of the blood sample for discovery purposes. We held that the State's failure to do so did not violate defendant's due process rights. Id. at 490.
Moreover, the recent United States Supreme Court decision in California v. Trombetta, ___ U.S. ___, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) is somewhat analogous in principle to our holding in the instant case that the consumption of the blood in the testing and the failure to retain any of the sample does not mandate a new trial. In Trombetta the court held that breath samples need not be preserved in order to introduce breathalyzer results in trials for driving while intoxicated and that the failure to preserve them does not violate a defendant's due process rights. See also State v. Teare, 135 N.J. Super. 19, 20-22 (App.Div. 1975).
In United States v. Picariello, 568 F.2d 222, 227 (1st Cir.1978) it was held that a three-pronged test was to be applied in *470 scrutinizing the record to determine whether there was a violation of defendant's due process rights. Such consideration includes: (1) whether the evidence was material to the issues of guilt or punishment; (2) whether defendant was prejudiced by its destruction, and (3) whether the government had acted in bad faith when it destroyed it. See Government of Virgin Islands v. Testamark, 570 F.2d 1162, 1167 (3d Cir.1978); United States v. Sewar, 468 F.2d 236 (9th Cir.1972), cert. den. 410 U.S. 916, 93 S.Ct. 972, 35 L.Ed.2d 278 (1973); State v. Serret, 198 N.J. Super. 21, 26-28 (App.Div. 1984); State v. Washington, 165 N.J. Super. 149, 155 (App.Div. 1979); State v. Nunez, 139 N.J. Super. 28, 33-34 (Law Div. 1976).
Here, there is no evidence from which we could determine that the sample would have been "material" to the defense. Defendant moved for an order compelling the State to produce the blood specimen six months after it had been obtained from him. According to the State's witness' report, which had been submitted with defendant's motion to dismiss the indictment, the alcohol content in a blood sample does not increase after three months of storage. There was some testimony by defendant's witness that without sufficient preservatives blood contaminated with certain yeast organisms can ferment, producing more alcohol. If that had happened in the instant case, the subsequent retesting would not have yielded a more accurate result, but any further fermentation would have produced even higher alcohol levels. Nevertheless, even such results would not necessarily indicate that the original test had been affected by fermentation. Nor do we think that the defendant was prejudiced by the destruction of this evidence. Defendant had every opportunity to question the test results without resort to the evidence itself both by cross-examination of the State's witnesses and through his own expert's testimony. See State v. Serret, supra, 198 N.J. Super. at 27. Moreover, there is no serious doubt about the State's good faith in failing to preserve any part of the blood sample. The person who performed the test testified that he usually exhausted an entire *471 specimen during testing and that in this case, he destroyed the blood sample after the test was completed.
Hence, where the State in good faith uses up, consumes or even disposes of the balance of a blood specimen in good faith, this does not preclude the admission of competent evidence of the test and the results at trial.[4] There being no evidence of bad faith on behalf of the prosecution nor any evidence that the samples would have been material to the defense or that defendant was prejudiced by the destruction of the blood samples, there was no error in admitting the test results into evidence.

III
We turn next to defendant's argument that his motion for a judgment of acquittal made pursuant to R. 3:18-2 or for a new trial (R. 3:20-1) should have been granted. A motion for acquittal pursuant to R. 3:18-2 is to be denied if the evidence, "viewed in its entirety, be it direct or circumstantial, and giving the State the benefit of all of its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, is sufficient to enable a jury to find that the State's charge has been established beyond a reasonable doubt." State v. Kluber, 130 N.J. Super. 336, 341-342 (App.Div. 1974), certif. den. 67 N.J. 72 (1975). Furthermore, a jury verdict may be set aside only where "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law." R. 3:20-1; R. 2:10-1; State v. Sims, 65 N.J. 359, 373-374 (1974).
*472 The prosecution of defendant here was for death by automobile in violation of N.J.S.A. 2C:11-5, as amended by L. 1983, c. 39, § 1 (effective January 26, 1983), which provides:
a. Criminal homicide constitutes death by auto when it is caused by driving a vehicle recklessly.
b. Death by auto is a crime of the fourth degree and notwithstanding the provisions of 2C:43-2, the court may not suspend the imposition of sentence on any defendant convicted under this section who was operating the vehicle under the influence of an intoxicating liquor, narcotic, hallucinogenic or habit-producing drug and any sentence imposed under this section shall include either a fixed minimum term of 120 days imprisonment during which the defendant shall be ineligible for parole or a requirement that the defendant perform a community related service for a minimum of 120 days.
c. For good cause shown the court may, in accepting a plea of guilty under this section, order that such plea not be evidential in any civil proceeding.
The term "recklessly" as used in this statute is defined in N.J.S.A. 2C:2-2b(3).[5] Intoxication is not a necessary element of the crime of committing death by auto, although a defendant's driving while intoxicated may support a determination of recklessness. Here, considering the evidence presented it was sufficient to warrant a conviction. Defendant had been drinking and was on the road at approximately 6 a.m. after having apparently gone without sleep for a considerable period of time; he said that he hit a pole because he swerved to avoid hitting a deer, although the police officer who testified indicated that there were no deer tracks. There was evidence that defendant's car had been travelling for about 110 feet partially on the shoulder of the road and was going at a high speed; that the "yaw" marks on the road indicated that the car had spun, and that there was no evidence that the brakes had been applied before the pole was hit. Taking into account the *473 testimony and the ability of the jury to determine credibility, we are satisfied that defendant's motions for a judgment of acquittal and in the alternative for a new trial were properly denied.

IV
We turn now to defendant's argument that his 18-month sentence with a period of four months' parole ineligibility was excessive. His motion for reduction of sentence was denied. Under N.J.S.A. 2C:11-5 death by auto is a fourth degree offense. Although there is a presumption against incarceration for a fourth degree crime, N.J.S.A. 2C:44-1e, the sentencing judge may consider the nature and circumstances of the offense as well as the aggravating circumstances enumerated in N.J.S.A. 2C:44-1a in determining whether incarceration is justified. A presumptive sentence of nine months is applicable where the court determines that imprisonment is warranted, unless the aggravating and mitigating factors weigh in favor of a higher or lower term. N.J.S.A. 2C:44-1f(1).
Although a parole ineligibility period may be imposed at half the maximum, here the judge imposed a four-month period. The judge noted that the aggravating factors included the death of the passenger in the car defendant was driving, and that although the death was unintentional, it was the result of defendant's acts. He also noted that defendant had been drinking and that there was a need to deter others. Defendant had no prior criminal record. The court, however, at sentencing also had before it defendant's driving record which indicated that from December 1969 through May 1979 he had had approximately 12 speeding tickets, had been involved in one way or another in seven accidents, and had his driving privileges suspended on three occasions.
The trial judge recognized that under the amended version of N.J.S.A. 2C:11-5b, which was in effect on the date of the March 13, 1983 accident, he could not suspend imposition of sentence and was required to either include a minimum of 120 days of *474 imprisonment or a minimum of 120 days of community related service. The judge decided that the need to deter others was the most significant aggravating factor justifying an increase in the sentence above the minimum mandatory sentence.
Based on our review of the record in light of the arguments in the briefs, we conclude that there was no mistaken exercise of sentencing discretion. State v. Roth, 95 N.J. 334, 363-365 (1984); State v. Whitaker, 79 N.J. 503 (1979).
The judgment under review is affirmed. The stay of sentence entered by the trial court pending the determination of this appeal is vacated.
NOTES
[1] The nail polish remover did not contain alcohol. It may have been utilized here in swabbing defendant's arm when taking a sample of his blood, rather than an alcohol swab, to avoid a claim that alcohol contained in the swab could possibly raise the percentage of alcohol found in the blood sample.
[2] See supra, n. 1.
[3] He also claimed a violation of N.J.S.A. 39:4-50.2(c) and (d) because he had not been told he could have his own chemical tests performed. We find it unnecessary to consider this statute or the issue discussed in State v. Hudes, 128 N.J. Super. 589, 607 (Cty.Ct. 1974), because defendant was not charged with driving while under the influence and that statute is inapplicable here.
[4] Of course, defendant may attempt to challenge the credibility of the reported results based on such subsequent unavailability of samples for further testing, and may argue as to the weight and probative value of the testimony.
[5] "A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. `Recklessness,' `with recklessness' or equivalent terms have the same meaning." N.J.S.A. 2C:2-2b(3).