947 A.2d 175 (2008)
400 N.J. Super. 319
STATE of New Jersey, Plaintiff-Respondent,
v.
Sky ATWATER, a/k/a Tyrone Johnson, Defendant-Appellant.
No. A-3771-04T4.
Superior Court of New Jersey, Appellate Division.
Submitted March 5, 2008.
Decided May 21, 2008.
*177 Yvonne Smith Segars, Public Defender, attorney for appellant (Alan I. Smith, Designated Counsel, on the brief).
Paula T. Dow, Essex County Prosecutor, attorney for respondent (Maryann K. Lynch, Assistant Prosecutor, of counsel and on the brief).
Appellant filed a pro se supplemental brief.
Before Judges WEFING, PARKER and R.B. COLEMAN.
The opinion of the court was delivered by
PARKER, J.A.D.
Defendant Sky Atwater, a/k/a Tyrone Johnson, appeals from a judgment of conviction entered on July 16, 2004 after a jury found him guilty on two counts of first degree vehicular homicide, N.J.S.A. 2C:11-5b(1), (2) and (3) (Counts 2 and 5); and two counts of third degree leaving the scene of an accident, N.J.S.A. 2C:11-5.1 (Counts 3 and 6). After the appropriate mergers, he was sentenced on Count 2 to a term of twelve years subject to 85% parole ineligibility; on Count 3, to a term of three years consecutive to the sentence imposed on Count 5; and on Count 5, he was sentenced to a term of ten years subject to 85% parole ineligibility consecutive to Count 2, for an aggregate term of twenty-five years. We reverse and remand for a new trial.
The charges against defendant arose on December 24, 2000, when two women crossing Turner Boulevard in Newark were struck and killed by a car driven by defendant. Several witnesses described the accident.
Shortly before midnight, Eston Robert Reid was driving on Turner Boulevard when he saw several people crossing the street toward the Masonic Temple where the First Ghanian Church of New Jersey was having a Christmas party. He stopped his 1988 Thunderbird in the left lane about five or six car lengths away to *178 allow the pedestrians to cross the street. Four young people crossed the street safely, and as two women, one elderly, were crossing the street, Reid saw headlights in his rear-view mirror that gained on him in seconds. He blew his horn to warn the women that a vehicle was coming in the right lane. Reid testified that the car was coming very fast, passed him on the right and struck the two women in the road. Reid got out of his car and ran to the women, and about fifty to sixty people came running from the Masonic Temple. Reid then went to defendant's car and saw that defendant was bleeding and trying to push the windshield off of him. Emergency vehicles arrived at the scene very soon after the accident.
Acting Fire Captain Ramon Rivera was on duty at Newark Fire Department Engine 12 on Turner Boulevard. He heard a car skid and then a loud bang. He and three other members of the Company drove their emergency vehicle to the scene, took charge, taped off the area and attempted to assist the victims, one of whom was already deceased and the other barely breathing. As Rivera approached defendant's car, defendant got out, bleeding and staggering. Rivera sat him on the curb and bandaged his head. While the firefighters were attending to the victims, defendant and his passenger left the scene, but left his car in the middle of the road. Rivera testified that the road was well-lit, the weather was clear and cold and there was no snow or ice on the ground.
A short while later, defendant's father, James Johnson, arrived at the scene. He spoke to police officers who later went to Johnson's home with him and found defendant there. The officers observed that defendant's head was bandaged, his speech was slurred, he was unable to stand without assistance and swayed and staggered as he walked. Officer Earl James Young detected a strong odor of alcohol from defendant.
Defendant was transported to the hospital where he was treated for his injuries. The officers later took him to Newark Police Headquarters. At 9:00 a.m. on December 25, defendant was advised of his Miranda[1] rights and he signed a waiver of rights form. Although defendant signed the waiver form, he was not questioned at that time because he appeared to be disoriented and was obviously injured.
On December 26, 2000, at about 9:45 a.m., defendant was again read his Miranda rights and he signed another waiver form. At the time, he appeared to be coherent and wanted to make a statement. He then gave the following statement describing the events that occurred on December 24, 2000, when he was driving his 1998 red Chevrolet Cavalier on Turner Boulevard.
We were going down Irvine Turner Boulevard in a normal flow of traffic. I was going about 25 miles an hour. A van[2] was slowing down in the left lane and I was in the right lane, and I noticed I started gaining up on the van. And that's when I noticed people running past the van trying to get across the street and I jammed on my brakes. And that's when the people got hit and I hit my head on the windshield and . . . blacked out.
When I came to, the car was at a complete stop. When I got out of the  I saw the lady's leg. And I wanted to see *179 how everybody was doing, but everybody started crowding me and everybody was screaming and I got scared. I got nervous so I left and went to my house to speak with . . . my mother to tell her to tell someone to go down there and tell them where I am located at. And then that's when the police came to my house. Then an ambulance came and took me to the hospital. Then I was arrested.
Defendant acknowledged that he had "a half a pint of E & J brandy split between three people" at about 11:00 p.m. and two beers between 9:00 and 10:00 that evening. When asked if he wanted to add anything to his statement, defendant said:
I want the world, the families, to know that I am severely sorry. It was an accident. I did not see them coming. I tried to stop and I wish they could accept my sympathy. And if I could bring them people back, I would for exchange for my life. I want them to know that I am not a criminal. I work hard every day to support my family, and I do have a heart.
At trial, Dr. Robert Pandina, a professor and Director of the Center for Alcohol Studies at Rutgers University, testified as an expert witness on behalf of the State that defendant's blood alcohol concentration (BAC) at the time of the accident was .07%, based upon defendant's statement of the amount he had to drink and his body weight. The expert testified that a BAC of .07% increases the risk of being involved in a serious fatal accident sixfold.
In this appeal, defendant argues:
POINT ONE
THE TRIAL COURT'S FAILURE TO CHARGE NEGLIGENCE CONSTITUTES REVERSIBLE ERROR
POINT TWO
LIMITING DEFENSE COUNSEL'S ABILITY TO CROSS-EXAMINE INVESTIGATOR ANDERSON CONSTITUTED AN ABUSE OF JUDICIAL DISCRETION AND RESULTED IN HARMFUL ERROR
POINT THREE
THE DEFENDANT'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED BY THE RESTRICTIONS IMPOSED BY THE TRIAL COURT ON DEFENSE COUNSEL'S SUMMATION
POINT FOUR
THE DEFENDANT'S RIGHT TO A FAIR TRIAL WAS PREJUDICED BY COMMENTS MADE BY THE PROSECUTOR IN SUMMATION (RAISED IN PART BELOW)
(A)
THE PROSECUTOR MISREPRESENTED THE FACTS
(B)
THE PROSECUTOR IMPROPERLY MALIGNED THE DEFENDANT AND SUGGESTED THAT THE JURY HAD A SOCIETAL DUTY TO CONVICT (NOT RAISED BELOW)
(C)
THE PROSECUTOR'S ASSERTION THAT FIREMAN RIVERA DID NOT SMELL ALCOHOL ON THE DEFENDANT BECAUSE IT WAS COLD OUTSIDE WAS IMPROPER BECAUSE IT REQUIRED EXPERT TESTIMONY (NOT RAISED BELOW)
POINT FIVE
IMPOSITION OF AN AGGREGATE 25 YEAR BASE CUSTODIAL SENTENCE WAS MANIFESTLY EXCESSIVE AND VIOLATED THE DEFENDANT'S *180 CONSTITUTIONAL RIGHTS UNDER BLAKELY V. WASHINGTON AND STATE V. NATALE

(A)
IN IMPOSING SENTENCE THE TRIAL COURT ENGAGED IN A "DELIBERATIVE PROCESS" THAT VIOLATED THE DEFENDANT'S RIGHTS UNDER STATE V. NATALE AND BLAKELY V. WASHINGTON

(B)
THE TRIAL COURT ABUSED ITS DISCRETION IN RUNNING THE SENTENCES IMPOSED ON COUNTS TWO AND FIVE CONSECUTIVE TO EACH OTHER

I
Defendant first argues that the trial court erred in failing to charge the jury on negligence. Relying on State v. Concepcion, 111 N.J. 373, 381, 545 A.2d 119 (1988), he contends that in certain circumstances "it is helpful for a court instructing a jury to inform it of other mental states as a comparison and to clarify the distinctions by illustrative examples." He maintains that "the jury needed to understand where negligence ended and recklessness began."
In denying defendant's motion to charge the jury on negligence, the trial court relied on State v. Pigueiras, 344 N.J.Super. 297, 781 A.2d 1086 (App.Div.2001), certif. denied, 171 N.J. 337, 793 A.2d 715 (2002). There, the defendant, driving while intoxicated, had a one-car accident causing severe, permanent injuries to his girlfriend, a passenger in his car. The defendant moved to have the jury charged on negligence and the trial court declined. In our decision, we noted that the trial court had no basis for charging the jury on negligence because of the "rather egregious . . . facts." Id. at 317, 781 A.2d 1086. We further noted that intoxication forms one of the aspects of recklessness and, accordingly, the reckless instruction must be given. In that case, however, the defendant was charged with aggravated vehicular assault, rather than vehicular homicide, as is defendant here. Moreover, in Pigueiras, the trial court permitted the defendant to argue negligence in summation and stated that "[u]nless the jury asked for further instruction on recklessness, he would not charge other mental states." Id. at 313, 781 A.2d 1086.
Defendant here relies on the medical examiner's testimony that the deaths were accidental, although the evidence presented at trial  defendant's speeding, passing the vehicle that had stopped in the left-hand lane to allow the pedestrians to cross the road and his drinking prior to the accident  indicated recklessness, rather than negligence. While in Pigueiras the defendant was permitted to argue negligence in summation, here defendant was not.
During deliberations, the jury asked for clarification of the charges three times: (1) "[w]hat is the definition of reckless manslaughter?"; (2) "[c]an vehicular homicide be intention[al] or unintentional?"; (3) "[w]e . . . would like to know the definition of vehicular homicide."
In response to the first question, the judge re-read the charge explaining reckless manslaughter. When the jury's second question was discussed by the court and counsel, defense counsel again requested an instruction on negligence:
Your Honor, it's the defense position that this is getting to the heart of an issue that we've discussed in our original request to charge, and that request to charge I don't need to repeat `cause *181 [sic] it was read into the record at our charge conference. However, the defense had requested that this Court charge[ ] the state of mind of negligence and incorporate that into the explanation of recklessness so that the jury has a  a guide or a bottom, if you would, to what recklessness is. And we interpret this question as really kind of going to the heart of that matter.
Unintentionally would fit the definition of negligently. Recklessness, I think we can all agree, is a hybrid state of mind. It has components of a conscious disregard of a risk that you are aware of so that it requires some intentional act. However  or some intentional disregard. However, it's not an intentional crime, like we would think of a knowing or purposeful crime being an intentional crime in a [m]ens rea[ ] sense.
Negligence does give the jury the context of understanding in its purest form what unintentional would mean. And Judge, I think that Pigueiras that we've discussed and we've given the cite before as 344 N.J. Super, Page 297[, 781 A.2d 1086], . . . by our Appellate Division. . . . That case said: All right, we don't have to worry about the Judge not charging negligence initially and not charging negligence when the jurors began asking questions, because their questions centered around the additional element in an aggravated manslaughter, which is extreme indifference to the value of human life.
So, I would say that our case now is not like Pigueiras but rather tracks far more closely . . . the case cited in Pigueiras, which is State v. Concepcion. . . . In State v. Concepcion, it wasn't a vehicular homicide, rather it was . . . a manslaughter charge, reckless manslaughter charge, involving a loaded gun that the defendant had kept in his home.
In that case, Judge, the Court initially did not charge negligence 
THE COURT: I'm familiar with the case.
[DEFENSE COUNSEL]: Okay. But what they did do in response to questioning by the jury is see what would have been more appropriate here is, first of all, to have the . . . recharge tracked better the question. But further, they added rather than repeating the abstract definition that left the jury uncertain in the first place, the trial Court might have explained recklessly by comparing it with other mental states, such as purposely, knowingly and negligently.
And Judge, I think that this situation tracks Conception and for those reasons, Judge, we would ask that you now include the language we originally proposed in our charge with regard to negligence to give the jury that needed comparison that they do not currently possess.
The prosecutor objected, stating "that to discuss negligence at this point so late in the game would muddy the definition of recklessness and, moreover, I loathe to begin participating in an exercise where we attempt to define the thoughts of these jurors." The court responded to defense counsel:
Let me address the concerns of counsel. I know counsel's genuine but his argument in this is denied. Intentional is a much more demanding standard than recklessness. It's not a less[er] than standard and when something is inquired to be either intentional or . . . unintentional, that simply means whether it's [re]quired to be either intended or not intended. Not intended is broad. It includes anything less than intentional, that may be reckless or something *182 less than reckless state of mind. It certainly doesn't contrast with negligent.
Many things can be unintentional and may be reckless. It may be negligent. They're not intentional. And to suggest that something that is not intentional [and] is, therefore, negligent misses the mark. Furthermore, it confuses the jury rather than instructs them  enlightens the jury when they ask about intent to charge negligence. Intent is not the specific contemplation in our statutes when they speak in terms of states of mind or speak in terms of knowing and purposeful states of mind in contrast to reckless state of mind, as I recall them. And each of them, knowing or purposeful, approaches much more intentional than negligence does.
And in that sense, something that is not intentional can be said perhaps to be questioned as to whether it's not knowing or not purposeful. But some of that is included in  some aspects of it are included in a reckless state of mind and some  some are included in a negligence state of mind, but not all. And the distinction is not sought by the jury between reckless and some other standard less than intentional, but they're inquiring about the difference between intentional and unintentional and they miss the mark in their question. . . . [T]hey can be refocused by instructing them as to reckless and telling them that the state of mind for homicide is a reckless state of mind, vehicular homicide is a reckless state of mind.
That's the reason I've chosen to take the course I mentioned earlier and said that I would invite comments from counsel. While you haven't changed my mind, you have had the opportunity to make a record for your positions in the event that that's necessary for review, should there be an unfavorable result to the position you've taken, Mr. McMahon.
. . . .
I am going to tell them that vehicular homicide requires a reckless state of mind, in accordance with the instruction that I'm about to give them, and I will then give them the instruction.
The jury was convened in the courtroom and the judge stated, "vehicular homicide requires the state of mind of recklessness," and re-read the vehicular homicide charge.
When the jury presented the third question the following day, defense counsel reiterated his request for a negligence instruction and asked for an expanded instruction on causation. The court indicated it was inclined to give the expanded instruction on causation over the State's objection. With respect to the negligence charge, the court denied defendant's request for the same reasons stated previously.
Defendant now argues that the trial court's failure to clarify the difference between negligent and reckless conduct after the jury's questions constitutes reversible error.
"Accurate and understandable jury instructions in criminal cases are essential to a defendant's right to a fair trial." Concepcion, supra, 111 N.J. at 379, 545 A.2d 119. The court must give "a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." State v. Green, 86 N.J. 281, 287-88, 430 A.2d 914 (1981).
In Concepcion, the defendant was charged with reckless manslaughter when he left a loaded gun he legally possessed on a bookshelf in his apartment and a social guest was subsequently killed when the gun went off. Id. at 375-77, 545 A.2d 119. The defendant testified that he saw *183 the victim pick up the gun and when he attempted to wrestle it away from her, it discharged. Id. at 375, 545 A.2d 119. After the court instructed the jury with the model charge on reckless manslaughter, the jury asked "for clarification of the definition of recklessness." Id. at 378, 545 A.2d 119. "The court limited its recharge to a repetition of the statutory definition of manslaughter." Ibid. The Supreme Court, in reviewing the charge, held:
[T]he jury's request for reinstruction suggests that some members of the jury did not understand sufficiently the concept of recklessness. Rather than repeating the abstract definition that left the jury uncertain in the first place, the trial court might have explained "recklessly" by comparing it with other mental states, such as purposely (N.J.S.A. 2C:2-2(b)(1)), knowingly (N.J.S.A. 2C:2-2(b)(2)), and negligently (N.J.S.A. 2C:2-2(b)(4)). The jury's understanding of these distinctions could have been enhanced if these mental states had been clarified by illustrative examples. On balance, we are persuaded that the charge in the context of the evidence in this case was not sufficient.
Because the charge in this case inadequately guided the jury in performing the critical task of determining defendant's guilt or innocence, we reverse the conviction and remand the matter to the Law Division for a new trial.
[Id. at 381, 545 A.2d 119 (emphasis added).]
Defendant contends that since the trial court did not allow him to argue negligence in summation, as did the court in Pigueiras, nor did it respond to the jury's questions by comparing recklessness "with other mental states," as did the court in Concepcion, the court committed reversible error. We agree.
The jurors' three questions made it clear that they were confused on the mental state required for a finding of guilt on vehicular homicide. The jurors heard evidence presented by the two medical examiners that the victims' deaths were accidental. In neither Pigueiras nor Concepcion was the jury faced with actual evidence of negligence as they were here. It is not surprising, therefore, that they were questioning "intentional" versus "unintentional" conduct in considering the charges.
We are aware of the cases holding that the trial court need not distinguish between recklessness and negligence in a reckless manslaughter charge. See, e.g., State v. Nutter, 258 N.J.Super. 41, 58-59, 609 A.2d 65 (App.Div.1992); State v. Reed, 211 N.J.Super. 177, 511 A.2d 680 (App.Div. 1986), certif. denied, 110 N.J. 508, 541 A.2d 1368 (1988); State v. Curtis, 195 N.J.Super. 354, 366, 479 A.2d 425 (App.Div.), certif. denied, 99 N.J. 212, 491 A.2d 708 (1984). Here, however, the trial court should have adopted the Concepcion holding and compared "reckless" with other mental states, such as negligence, after the jury's repeated questions indicated their confusion on the definition of "reckless." Having precluded defendant from arguing negligence and having failed to clarify the jury's confusion on the requisite mental state, the trial court left the jury without guidance to evaluate the evidence in light of the applicable law. Accordingly, we reverse and remand for a new trial.
Although our reversal on the jury charge disposes of the appeal, we will address certain other issues raised by defendant to provide guidance on retrial.

II
Defendant argues in Point Two that the trial court improperly limited his cross-examination of the State's accident *184 reconstruction expert, Arnold Anderson, an investigator with the Prosecutor's Vehicular Homicide Unit. On direct examination, Anderson testified that defendant's vehicle was traveling at a speed between forty-five and fifty-one miles per hour at the time of the accident. To reach that conclusion, Anderson testified that he used a number of factors, including the "coefficient of friction for an asphalt roadway . . . between a .55 and a .71."
On cross-examination, defense counsel asked Anderson about the coefficient of friction and Anderson responded that it was a range and "the upper end of the scale is more accurate than the lower end." Defense counsel then asked if Anderson had included that information in his report. Before the witness could answer, the trial court, sua sponte, called counsel to side bar and advised that he would not strike the comment, "but . . . I'm not going to permit you to cross-examine him in ways to suggest that something should have been in his report and is inconsistent with his report." Defense counsel objected and indicated he would ask Anderson if he made reference to the upper range in his report. The court said, "I'm gonna [sic] strike it," and defense counsel then asked for a mistrial. The mistrial was denied and defense counsel continued to question Anderson on the road surface and coefficient of friction. The court again interrupted the cross-examination, sua sponte, stating, "I'm not gonna [sic] permit questions about Grand Jury because that's something he said somewhere else."
Anderson testified that the coefficient of friction was a necessary element in calculating defendant's speed. Defendant argues that limiting his ability to cross-examine Anderson on the accuracy of his calculation "impaired [his] ability to establish reasonable doubt as to his guilt." We agree.
"A trial judge has broad discretion to determine the proper limits of cross-examination of a witness whose credibility is put in issue." State v. Engel, 249 N.J.Super. 336, 375, 592 A.2d 572 (App. Div.), certif. denied, 130 N.J. 393, 614 A.2d 616 (1991). Nevertheless, "the appellate court need not be as deferential to the trial court's ruling on the admissibility of expert scientific evidence as it should be with the admissibility of other forms of evidence." State v. Torres, 183 N.J. 554, 567, 874 A.2d 1084 (2005) (citing State v. Harvey, 151 N.J. 117, 167, 699 A.2d 596 (1997), cert. denied, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000)).
Here, Anderson testified that the coefficient of friction was necessary to calculate defendant's speed at the time of the accident. Since defendant's speed goes to the element of recklessness, defendant should have been permitted to cross-examine the expert on the coefficient of friction, to inquire whether the expert had included the information in his report and to inquire whether the expert's testimony at trial differed from his testimony elsewhere, including before the Grand Jury.
"Once an expert opinion is deemed admissible (that is, it is not excluded as a net opinion), the data and the totality of the facts on the basis of which the expert arrived at the opinion must be made known to the factfinder so that it may evaluate the validity of the opinion and conclude what weight, if any, it should give to that opinion." Biunno, Current N.J. Rules of Evidence, comment 4 on N.J.R.E. 703 (citing Bowen v. Bowen, 96 N.J. 36, 50, 473 A.2d 73 (1984)). "Insufficient factual support for an opinion undermines its foundation and justifies its rejection by the trier of fact." Ibid. (citing Champion Dyeing v. Centennial Ins., 355 N.J.Super. 262, 273-74, 810 A.2d 68 (App.Div.2002)). Inquiry into the factual support underlying *185 the expert's calculation of defendant's speed, therefore, was legitimate and defense counsel should have been permitted to pursue the inquiry so that the jury could make its own determination as to whether the expert's calculations were reliable. See State v. R.W., 104 N.J. 14, 30, 514 A.2d 1287 (1986). The court's failure to allow the cross-examination of the expert on the coefficient of friction, over defendant's objection and motion for a mistrial, is reversible error.

III
Defendant next argues that the trial court erred in prohibiting defense counsel from arguing in summation that defendant was merely negligent. In our earlier discussion of Pigueiras, we noted that in denying the defendant's request to charge the jury on negligence, the trial court there did allow the defendant to argue negligence in summation. While we agree that defendant should have been permitted to make the argument, its preclusion by itself, does not rise to the level of reversible error. Here, however, it contributes to cumulative error.

IV
Defendant next contends that a number of comments made by the prosecutor in summation unduly prejudiced the jury. In reviewing closing arguments, we look, not to isolated remarks, but to the summation as a whole. State v. Carter, 91 N.J. 86, 105, 449 A.2d 1280 (1982). Prosecutors are permitted "to make vigorous and forceful closing arguments to juries." State v. Timmendequas, 161 N.J. 515, 587, 737 A.2d 55 (1999), cert. denied, 534 U.S. 858, 122 S.Ct. 136, 151 L.Ed.2d 89 (2001). Nevertheless, prosecutors must limit their remarks to the evidence, State v. Frost, 158 N.J. 76, 86, 727 A.2d 1 (1999), and refrain from unfairly inflaming the jury. State v. Johnson, 31 N.J. 489, 511, 158 A.2d 11 (1960). The prosecutor may not "characterize the defense attorney and the defense [in inflammatory terms such] as outrageous, remarkable, absolutely preposterous and absolutely outrageous." State v. Acker, 265 N.J.Super. 351, 356, 627 A.2d 170 (App.Div.), certif. denied, 134 N.J. 485, 634 A.2d 530 (1993). "`A prosecutor is not permitted to cast unjustified aspersions' on defense counsel or the defense." Ibid. (quoting State v. Lockett, 249 N.J.Super. 428, 434, 592 A.2d 617 (App.Div.), certif. denied, 127 N.J. 553, 606 A.2d 366 (1991)).
The evidence indicated that defendant's BAC at the time of the accident was .07%, below the per se level for statutory intoxication, which was .10% at the time. N.J.S.A. 39:4-50. Defendant maintains that the following comments by the prosecutor were highly prejudicial.
PROSECUTOR: Was he driving with his eyes closed? Or was he so blotto [sic] it didn't matter?
. . . .
When you've looked at all the circumstances of this case, and all of the actions of the defendant here, you've got to ask yourself was he drunk or did he just not care? It's got to be one or the other. We know Jerome [sic] Reid, Eston Reid, doesn't drive this way. What business did he have driving that way. . . . There's a great sense of outrage that it may be easy to feel and I'm not going to ask you  I'm gonna [sic] ask you to not focus on it because there's too much at stake here. There's the facts. The facts here are all you need to get you to the other side. And ladies and gentlemen, in the very infinitesimal way that justice might be available in this case? In some small way? Ladies and gentlemen, that's all the State asks for?
. . . .

*186 He comes up to Eston Jerome [sic] Reid's car and what's he do? Does he slow down? Does he brake? Does he honk? What does he do? He steps on his accelerator. The women, five or six car lengths ahead of him, he's closing in on the kill.

. . . .
Defendant bolts. He's not sticking around. The end of his statement to Detective Palermo, he says how sorry he is. He'd exchange his life for this  for these two women. Doesn't stop him from stepping over the body parts on his way out of the scene.

. . . .
Firefighter Rivera administers first aid. Says he didn't smell alcohol. Well, Firefighter Rivera's got a lot of concerns on his mind at that moment. There's bodies strewn about the roadway. People in far more serious condition than the defendant and it's cold. What does cold do to smell?

[Emphasis added.]
In each of these instances, the prosecutor overstepped the bounds of propriety. Because defendant raised no objection to these particular remarks,[3] we must disregard any error unless it is "clearly capable of producing an unjust result." State v. Daniels, 182 N.J. 80, 95, 861 A.2d 808 (2004) (quoting R. 2:10-2). Reversal of defendant's conviction is required only if there was error "sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached." Ibid. (quoting State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971)).
In determining whether a prosecutor's comments deprived the defendant of a fair trial, we "consider `(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them.'" Daniels, supra, 182 N.J. at 96-97, 861 A.2d 808 (quoting State v. Smith, 167 N.J. 158, 182, 770 A.2d 255 (2001)). Where there was no objection at the time, there is an inference that the defense did not view the summation as prejudicial in the context of the trial. Frost, supra, 158 N.J. at 83, 727 A.2d 1. "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." Ibid.
In reviewing the prosecutor's remarks in the context of his summation as a whole, we are convinced that these remarks did have the capacity to unfairly influence the jury and deprive defendant of a fair trial. The prosecutor repeatedly referred to defendant as "drunk" or "blotto" when the evidence did not support the inference that defendant met the legal standard for intoxication. Nor was there any evidence in the record from which the jurors could answer the prosecutor's question "[w]hat does cold do to smell?" That question called for speculation on the part of the jurors. Moreover, we are particularly offended by the prosecutor's comment: "he's closing in on the kill." There was no evidence whatsoever that defendant acted intentionally or that he was in any way focused on hitting the victims, as this remark suggests. Indeed, the prosecutor's remarks would, by themselves, have led to reversible error in this case.

*187 V
We find no merit in defendant's sentencing arguments. He challenges the consecutive sentences on the two counts of first degree vehicular homicide and the third degree count of leaving the scene of an accident. Each count constituted a separate and distinct crime that warranted consecutive sentences. State v. Yarbough, 100 N.J. 627, 498 A.2d 1239 (1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986).
Defendant further argues that in imposing an aggregate term of twenty-five years, the trial court violated the principles articulated in Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004); and State v. Natale, 184 N.J. 458, 878 A.2d 724 (2005). We disagree. Here, defendant was sentenced below the presumptive or mid-range term for each of the first degree offenses and at the mid-range for the third degree offense. Each of these terms is consistent with Blakely and Natale.

VI
Finally, defendant has submitted a pro se supplemental brief in which he argues:
POINT ONE
DEFENDANT WAS DENIED A FAIR TRIAL AND DUE PROCESS OF LAW WHEN THE COURT FAILED TO PROPERLY CHARGE THE JURY ON THE CORRECT LEGAL STANDARD FOR DRIVING UNDER THE INFLUENCE OF INTOXICATING LIQUOR
In his pro se brief, defendant essentially argues that the trial court should have charged the jury that the required BAC for a per se DWI was .10% at the time of the offense in 2000.[4] He maintains that the jury was left to speculate whether defendant was legally drunk when, in fact, the expert testified that his BAC was .07%.
Defendant relies on State v. Lane, 288 N.J.Super. 1, 671 A.2d 1045 (App.Div. 1995), in which the defendant was convicted of reckless manslaughter, death by auto and several motor vehicle offenses. The evidence at trial indicated that his BAC at the time of the accident was .253%. Id. at 5, 671 A.2d 1045. The defendant there argued that the court erred in "instruct[ing] the jurors that if they found defendant's blood alcohol level was 0.10 percent or higher they could presume recklessness." Id. at 12, 671 A.2d 1045. We found that the court "never mentioned a presumption, but merely told the jurors that if they found this level of blood alcohol, it was one factor from which they could infer recklessness. This was proper." Ibid.
Where alcohol is presented as evidence of recklessness, the State must present evidence of the defendant's BAC at the time of the incident. State v. Casele, 198 N.J.Super. 462, 472, 487 A.2d 765 (App. Div.1985) (holding that evidence of intoxication, together with the circumstances of the accident, were sufficient to demonstrate recklessness). Here, however, although the State argued that defendant was "drunk" or "blotto" at the time of the accident, it merely demonstrated that his BAC was .07%  well below the .10% limit for legal intoxication under the DWI statute in effect at the time.
While we do not consider an instruction on the legal limit for DWI mandatory in every case of a vehicular homicide, *188 it is in this case. Where there is evidence that the driver may have been impaired by the use of alcohol, but no evidence that he was driving while intoxicated under the statutory standard, the court should instruct the jury on the BAC required for a per se DWI. While the trial court's failure to include the instruction may not ordinarily rise to the level of plain error, here, where there were a number of reversible errors, the court's failure to include a charge on the BAC required for per se intoxication under the statute contributed to the cumulative errors.

VII
In summary, we find that the trial court committed reversible error in failing to compare "reckless" with other mental states, such as negligence after the jurors' questions indicated their confusion on the reckless manslaughter charge. We further find reversible error in the trial court's preclusion of defendant's cross-examination of the State's accident reconstruction expert and in its allowing the prosecutor to make numerous inflammatory and speculative remarks to the jury in summation. Moreover, the trial court's denial of defendant's application to argue negligence in summation under the circumstances of this case contributed to cumulative error. Finally, the trial court's failure to instruct the jury on the BAC required under the statutory standard for driving while intoxicated contributed to the cumulative error where there was evidence that defendant may have been impaired by the use of alcohol, but not intoxicated under the statutory standard.
Reversed and remanded for a new trial.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] We note that Reid testified that he was driving a 1988 Thunderbird, not a van, and there is no evidence that any other vehicles were on the road at the time.
[3] Defendant did object to other remarks, allowing the trial court to give curative instructions to the jury.
[4] N.J.S.A. 39:4-50 was amended in January 2004 to reduce the BAC for driving while intoxicated (DWI) from .10% to .08%.