**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0265-20

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DWAYNE S. PENIX,

    Defendant-Appellant.

_____

Argued March 31, 2022 – Decided June 21, 2022

Before Judges Haas and Alvarez.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 18-11-0666.

Robin Kay Lord argued the cause for appellant.

Ryan William Sundstrom, Assistant Prosecutor, argued the cause for respondent (Angelo J. Onofri, Mercer County Prosecutor, attorney; Ryan William Sundstrom, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Dwayne S. Penix of first-degree robbery, N.J.S.A. 2C:15-1(a)(2), and fourth-degree possession of an imitation firearm for an unlawful purpose, N.J.S.A. 2C:39-4(e).  On August 13, 2020, the trial judge, after finding aggravating factors three and nine, N.J.S.A. 2C:44-1(a)(3) and (9), and no factors in mitigation, merged the possession offense into the robbery, and sentenced defendant to twelve years subject to the No Early Release Act's eighty-five percent parole ineligibility, N.J.S.A. 2C:43-7.2.  Defendant appeals, and we affirm.

On the evening of December 23, 2017, a Family Dollar Store cashier was confronted by a masked man holding a silver object she believed was a gun.  She fled to the manager's office, called for help, and when she returned, the cash drawer was missing.  She told police the assailant wore a gray jumpsuit.

Another store employee saw the robbery and fled through a rear exit.  She claimed the suspect was wearing an orange jacket.

Lisa Dickerson, who lived near the store, was heading towards her car when she saw a man "wearing a camouflage pattern" exit a green minivan.  The man said "hello."  As Dickerson drove past the Dollar Store, she noticed the same man run across the street.  Curious about his activities, she turned and followed him the wrong way down the one-way street, watching as he tossed

something in the air. Dickerson then lost sight of him. As she turned her car around to go in the correct direction, she heard sirens and saw the man pounding on her front door, wearing a white t-shirt. Dickerson approached, and he told her he was looking for "Erica Peterson." When she said no one by that name lived there, he ran away. Dickerson wrote down his license plate number and reported it to an officer, who radioed the information to dispatch.

Larry Steepy also lived in the neighborhood. When the crime occurred, he was outside and heard what sounded like "someone shaking a can [full of] coins coming down the street." Steepy described the person he saw running past him as a "black male [six] feet tall weighing approximately 160 to 185 pounds, wearing a light gray or brown colored heavy coat" or hoodie. The man continued towards an empty building across the street, tripping over a chain strung across a driveway. After getting up, he continued into the back yard. Steepy also saw a car going the wrong way down the street. He too reported his observations to police.

Hamilton Township Police Officer David Warrick and his partner were operating their patrol car in the vicinity of the store when they noticed a van matching the description of the perpetrator's vehicle being operated without

A-0265-20

headlights. Shortly thereafter, the driver briefly activated the van headlights, and complied when officers signaled to stop.

The officers treated the encounter as a "felony motor vehicle stop." Defendant, the driver, was wearing a dark colored hoodie, white t-shirt, jeans, and muck boots. He and the van were taken to the police station, where he gave a Mirandized statement denying any knowledge of the robbery.

Officer John Furyk arrived and processed the empty buildings for evidence that same night. He found coins on the ground near the chain in the driveway. In the back yard, he found an upturned bin, and about ten to fifteen feet away, a black mask. Both the bottom of the bin and the mask were dry even though it had rained earlier that evening. Beneath the bin was a cash drawer along with a silver soft pellet handgun. Furyk also found a pair of size thirteen sneakers by the rear porch underneath a sheet of plywood.

Police obtained a search warrant for defendant's van and seized a raincoat that matched the jacket seen on the store surveillance video, a pair of gloves, and a Misty Harbor jacket; defendant was indicted on November 14, 2018. A few months later, in February 2019, the State moved to compel defendant to provide a buccal swab for comparison with DNA material on the black mask. The State submitted a supporting affidavit reciting the Family Dollar Store

4

personnel and neighbors' accounts we have described and the items Furyk collected. The motion was granted despite defendant's opposition.

A car was stopped in the early morning hours of January 18, 2020. Defendant was sitting in the rear with an open bottle of alcohol. Officers searched the car, and discovered a gun under the front passenger seat. Defendant was charged with unlawful possession of a weapon and possession of a weapon for unlawful purposes.[1]

Defendant retained a second attorney, Mark Fury, to defend against the gun charges. At the February 3, 2020 pretrial conference on the gun charges, Fury informed the court he might be substituting in for defendant's first attorney on the robbery indictment. The court had been scheduled to hear the State's application to revoke defendant's release, filed not only because of the two new charges, but also because of defendants' repeated failure to report. Before the hearing began, the court granted Fury's motion to substitute in, relying upon Fury's certification that he was ready for trial on the robbery charges. Release was denied.

The trial began February 12, 2020, some nine days later. The store clerks and neighborhood residents were called as State's witnesses. On the stand,

---

[1] The precise nature of the charges and the disposition are unknown.

 A-0265-20

Steepy did not mention a vehicle traveling in the wrong direction, while Dickerson departed significantly from her prior statement. The State applied for relief under State v. Gross, 112 N.J. 1 (1990), to admit Dickerson's statement as evidence because she testified significantly at variance from her prior statement. The trial court granted the application.

The State also called Christine Bless, a forensic scientist, who said at least three individuals contributed to the DNA on the black mask, with a major profile from defendant and at least two minor profiles from others. She explained that in order to be identified as the source of a major DNA profile:

> . . . you have to have -- when we do the statistical analysis and figure out how rare a particular match is, if it is more rare then one in seven trillion, then we say that that person is the source of that DNA on the item.
>
> So if you picture a thousand worlds, each with a population of seven billion, you would expect to find someone to match that profile one time on those thousand earths with each with a population of seven billion.

Her report as well as accompanying allele tables were admitted into evidence. Defendant's attorney objected, claiming they were incomplete and nothing more than worksheets rather than an expression of Bless's opinion. The items were nonetheless admitted.

On cross-examination, Fury and Bless engaged in the following colloquy:

6

Fury: And as we say in this business and you make that representation to a scientific certainty?

Bless: That is not a phrase that we use. Can you define what you mean by that?

Fury: Well, you're offering an expert opinion, right?

Bless: Yes.

Fury: Okay. And your expert opinion is based on the science that you've here explained, correct?

Bless: Yes.

Fury: And so your opinion is based on the science, right?

Bless: Mm-mm.

Fury: And that's the scientific certainty to which I refer.

Bless: I'm not sure what you mean by certainty but I am confident of my results and to the best of my ability and my experience and knowledge, that is the interpretation, the reported results are -- I support them, agree with them and that is what I have to offer.

Fury neither objected to the expert's testimony nor the expert's qualifications.

While summing up, Fury asked defendant to stand so the jury could see that defendant was shorter than the six feet Dickerson described in her statement.

A-0265-20

He asserted that the State did not introduce a picture of the sneakers found at the empty house because they were not defendant's size.

Fury also contended the mask which was found to bear defendant's DNA had been stolen from his van prior to the robbery. He had forgotten to elicit testimony on the theft from the police witness, but maintained the testimony was unnecessary because a photograph of the van admitted into evidence showed it had a broken window, and the jury could infer the break-in from that picture.

During his summation, the prosecutor placed some evidence in front of the jury without permission, and Fury objected. The court sustained the objection and reminded the jury that they would have the evidence in the jury room.

After the two closings, the State produced a police report that did not mention a theft, only that a juvenile had broken the van's window. The State requested a Clawans[2] charge because defendant had suggested a theft occurred although there was no evidence of one. The judge refused, and during the exchange, Fury acknowledged that he knew about the police report during the trial, well before closings.

On appeal, defendant raises the following points:

---

[2] State v. Clawans, 38 N.J. 162 (1962).

A-0265-20

POINT I

THE TRIAL COURT ERRED BY FINDING THAT THE STATE HAD PROVEN SUFFICIENT PROBABLE CAUSE TO COMPEL THE DEFFENDANT TO PROVIDE A BUCCAL SWAB DNA SAMPLE.

POINT II

THE TESTIMONY OF CHRISTINE BLESS AS TO THE RESULTS OF THE DNA ANALYSIS AND THE PROBABILITY CALCULATION SHOULD HAVE BEEN STRICKEN FROM THE RECORD BECAUSE HER RESULTS WERE NOT COUCHED IN TERMS OF A REASONABLE SCIENTIFIC CERTAINTY OR PROBABILITY. (Not Raised Below).

POINT III

DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AND IS THEREFORE ENTITLED TO A NEW TRIAL. (Not Raised Below).

    A.    MOTION TO SUPPRESS.
    B.    REQUEST FOR ADJOURNMENT.
    C.    OPENING/CLOSING STATEMENTS
    D.   DISMISSAL AND NEW TRIAL MOTIONS.

POINT IV

THE INSTRUCTIONS TO THE JURY WERE FLAWED AND REQUIRE REVERSAL OF DEFENDANT'S CONVICTION. (Not Raised Below).

POINT V

DEFENDANT IS ENTITLED TO A NEW TRIAL BASED UPON CUMULATIVE PROSECUTORIAL MISCONDUCT. (Partially Raised Below).

POINT VI

DEFENDANT IS ENTITLED TO A NEW TRIAL DUE TO CUMULATIVE ERROR.

POINT VII

DEFENDANT'S SENTENCE IS EXCESSIVE.

I.

We consider defendant's first point on appeal to be so lacking in merit as to not warrant much discussion in a written opinion. R. 2:11-3(e)(2). When the State seeks to compel a biological sample post-arrest, it must establish probable cause. State v. Gathers, 234 N.J. 208, 222 (2018). Probable cause requires a fact-sensitive inquiry which takes into consideration "the totality of the circumstances." In re State ex rel. A.D., 212 N.J. 200, 231 (2012). Probable cause will be established if there is "a fair probability that contraband or evidence of crime will be found in a particular place." Gathers, 234 N.J. at 223. The circumstances surrounding defendant's initial arrest, including observations by neighborhood residents, and the evidence seized from the back yard and his

10

van established more than ample probable cause for the buccal swab to be taken. The motion to suppress was properly denied.

## II.

The argument that the testimony of the State's DNA expert regarding the mask should be suppressed because she did not frame her testimony in terms of a "reasonable scientific certainty or probability" also lacks merit. Although an expert offering scientific opinion testimony must do so within a reasonable degree of certainty or probability, no magic words need be said in order to satisfy the requirement. State v. Fortin, 178 N.J. 540, 597 (2004), as clarified (Feb. 6, 2004); State v. Howard-French, 468 N.J. Super. 448, 466 (App. Div. 2021) ("[T]he certainty requirement does not oblige experts to use talismanic or magical words[.]") (internal quotation marks omitted), cert. denied, 248 N.J. 592 (2021).

On cross-examination, defendant's counsel requested that the expert provide "scientific certainty," and she did so both by affirming her credentials, and stating that her opinion was based on the scientific testing of the material. The expert opined that she was certain of defendant's profile when she declared that a match is found only when "it is more rare than one in seven trillion." There was no necessity that any magic words be used. The expert's opinion was

11

not capable of producing an unjust result. She explained the meaning of the testing result that defendant was the major contributor even if DNA belonging to two other persons was found on the mask.

The admission of the allele tables did not violate defendant's right to confrontation. The witness was questioned with regard to the tables, and was cross-examined about them.

## III.

We do not reach defendant's claim of ineffective assistance of counsel. "[I]neffective assistance claims, generally, are more appropriately raised in collateral, post-conviction relief proceedings 'because such claims involve allegations and evidence that lie outside the trial record.'" State v. Johnson, 365 N.J. Super. 27, 34 (App. Div. 2003) (quoting State v. Preciose, 129 N.J. 451, 460 (1992)). We will not address the point further.

## IV.

Defendant argues the judge should have given the following model jury charge, recommended for trials in which no in- or out-of-court identification is made:

> The burden of proving the identity of the person who committed the crime is upon the State. For you to find this defendant guilty, the State must prove beyond a reasonable doubt that this defendant is the person who

committed the crime. The defendant has neither the burden nor the duty to show that the crime, if committed, was committed by someone else, or to prove the identity of that other person. You must determine, therefore, not only whether the State has proven each and every element of the offense charged beyond a reasonable doubt, but also whether the State has proven beyond a reasonable doubt that this defendant is the person who committed it.

[Model Jury Charges (Criminal), "Identification: No In- or Out-of-Court Identification" (approved October 26, 2015).]

Although defendant did not request the charge, he contends it should have been given by the judge sua sponte because the identity of the robber was key. The State argues the jury instruction regarding the State's burden to prove its case beyond a reasonable doubt satisfied the purposes of the model jury charge. That argument fails on its face because if true, there would be no need for the instruction to be given as in every case the judge defines beyond a reasonable doubt.

We evaluate the omission of a charge "in the context of the State's entire case against defendant." State v. Harris, 156 N.J. 122, 183 (1998). Since defendant did not request the charge, the claim is measured by the plain error standard.

A-0265-20

The circumstantial evidence accumulated against defendant, which included DNA evidence, was strong. So long as the jury assessed the identification testimony employing the beyond a reasonable doubt standard and instruction, that sufficed. The evidence left no reasonable doubt as to the identity of the perpetrator.

V.

Defendant also contends that he is entitled to a new trial based upon cumulative prosecutorial misconduct. Prosecutors are afforded considerable leeway in closing so long as their comments go to the facts shown by or reasonably inferred from the evidence. State v. Frost, 158 N.J. 76, 82 (1999); State v. R.B., 183 N.J. 308, 330 (2005).

"A prosecutor is not permitted to cast unjustified aspersions on defense counsel or the defense." State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008). Comments that characterize the defense in inflammatory terms such "as outrageous, remarkable, absolutely preposterous and absolutely outrageous" are unacceptable. Ibid. A prosecutor is also forbidden from climbing into the jury box during the defense's presentation of evidence. State v. Rivera, 437 N.J. Super. 434, 453–55 (App. Div. 2014).

Whether the prosecutor's error pertains to closing statements, a new trial is only warranted if the error "deprived the defendant of a fair trial." State v. Allen, 337 N.J. Super. 259, 267–70 (App. Div. 2001). To decide if this standard is met,

> [a]n appellate court "must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred." Specifically, an appellate court must consider (1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks [be] stricken from the record and instructed the jury to disregard them.
>
> [Id. at 267.]

It is true that defense counsel objected when the prosecutor entered the "jury well" and showed jurors the evidence he had not been specifically authorized to present to them. The items had been admitted in evidence, however, and the intrusion into the "jury well," the extent of which cannot be ascertained from the record, lasted less than a minute. Upon defense counsel's objection, the prosecutor immediately removed the evidence from the well. Given that the item or items of evidence were included in the materials given to the jury for their consideration, no error occurred.

15

There is no question that the prosecutor described the defense as "ridiculous" on one occasion. This was a reference to the argument that he made that his mask was stolen, someone used it, and placed it at the location of his arrest. The reference was brief. Thus, defendant is not entitled to a new trial based on the prosecutor's comments or upon cumulative prosecutorial error, as no error occurred.

## VI.

Defendant also contends that his sentence was excessive and that he should have been sentenced to only ten years, not twelve, because the gun used during the robbery was not a real weapon, and no one was injured during the incident. Our Supreme Court has summarized the analysis a trial judge should employ in selecting the range of sentence as follows:

> Whether a sentence should gravitate toward the upper or lower end of the range depends on a balancing of the relevant factors. "[W]hen the mitigating factors preponderate, sentences will tend toward the lower end of the range, and when the aggravating factors preponderate, sentences will tend toward the higher end of the range." The balancing process, however, is more than counting whether one set of factors outnumbers the other. Rather, the court must qualitatively assess the relevant aggravating and mitigating factors, assigning each factor its appropriate weight.
>
> [State v. Case, 220 N.J. 49, 64-65 (2014).]

A-0265-20

The judge during the sentence hearing thoroughly discussed defendant's criminal history, including the fact that at age forty, he had accumulated six disorderly persons convictions since 2011, and a PTI dismissal in 2015, and was arrested a second time while these charges were pending. The second arrest occurred at 2:00 a.m. when he was found in a vehicle with drugs and a gun, while inebriated, in violation of his pretrial release conditions on these charges. As a result, the judge found aggravating factor three, N.J.S.A. 2C:44-1(a)(3), the risk that defendant would reoffend, and aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), the need to deter him and others.

As the judge explained, in most cases as people age, their criminality lessens, while in defendant's situation, the contrary seemed to be occurring. She found no factors in mitigation. Because of the weight she accorded aggravating factors three and nine, she determined that a twelve-year term of incarceration, at the low end of the range, was the appropriate sentence.

We vacate sentences when we conclude that the sentence imposed by the trial judge violates the Code, the aggravating and mitigating factors are not supported by credible evidence, or the sentence is clearly unreasonable because it shocks the judicial conscience. State v. Roth, 95 N.J. 334, 364-66 (1984). Clearly, defendant's sentence, at the low end of the range, passes muster under

that test.  The judge accorded the appropriate weight to both aggravating factors. Our conscience is not shocked.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0265-20